CHRISTOPHER M. EDWARDS, Plaintiff-Appellant, v. PADDOCK PUBLICATIONS, INC., *et al.*, Defendants-Appellees.

First District (4th Division)    No. 1—00—0599

Opinion filed November 15, 2001.—Modified on denial of rehearing January 24, 2002.

O'Callaghan & Colleagues, P.C., of Chicago (Joseph Michael O'Callaghan and Christopher Maurer, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (Edward P. Gibbons, Hugh C. Griffin, and Hugh S. Balsam, of counsel), for appellees.

JUSTICE THEIS delivered the opinion of the court:

Plaintiff, Christopher M. Edwards, filed an action against defendants, Paddock Publications, Inc., the publisher of the Daily Herald, and several of its reporters and editors, alleging defamation and false light arising from certain newspaper articles that misidentified plaintiff as having been arrested in conjunction with a drug "bust" in the northwest suburbs. Defendants' theory of the case was that they received the misidentified information from the police and were therefore entitled to a fair report privilege. The trial court entered a directed verdict for defendants on plaintiff's negligence count and directed a verdict for three editor defendants on all other counts. After the jury answered "no" to a special interrogatory asking whether the police were the source of the misidentified information, the jury returned a verdict in favor of the remaining defendants on the remaining counts of the complaint.

Plaintiff contends that the trial court erred (1) in directing a verdict on the negligence count where plaintiff presented sufficient evidence for the jury to determine whether defendants failed to exercise reasonable care; (2) in allowing defendants to present the fair report privilege to the jury; (3) in submitting defendants' reckless disregard instruction to the jury; (4) in allowing certain documents bearing a photograph of plaintiff to be admitted into evidence; (5) in dismissing the editor defendants where plaintiff presented sufficient evidence that they acted with reckless disregard; (6) in allowing the introduction of undisclosed opinion testimony; (7) in denying plaintiff's motion to amend the complaint to seek punitive damages under its theory of false light; and (8) in failing to grant him a new trial where the jury's answer to the special interrogatory was inconsistent with the general verdict. For the following reasons, we reverse the judgment of the circuit court and remand for a new trial.

## BACKGROUND

In 1990, the Illinois State Police entered into a joint undercover operation with the Hoffman Estates and Schaumburg police departments to combat the growing gang problem in the northwest suburbs. The operation was dubbed "Operation Erinnyes" (Operation), after the three crime-avenging sisters in Greek mythology, also known as the Furies. Defendant Anne Gasior was a features reporter for the Daily Herald newspaper (the *Herald*) who, upon learning of the investigation, gained approval for herself and other staff reporters to participate in the operation and accompany police on undercover assignments. She proposed to her editors, defendants Jean Rudolph and John Lampinen, to write a number of articles on the operation, focusing on the arrests and the growing gang problem. Defendant John Carpenter, a reporter in the news department, was also assigned to cover the project.

As the operation progressed, Gasior and Carpenter received a number of oral briefings and interviewed participating officers regarding the suspects, including Christopher Edwards. On occasion, they would accompany the police on surveillance during undercover drug purchases. However, it was understood that none of the information acquired would be published until after the suspects were arrested. At some point early in the investigation, Carpenter found a photograph of a Christopher Edwards in the Hoffman Estates High School yearbook and showed it to Gasior. It was the only Christopher Edwards depicted in the yearbook. The book also included information about him as a star football player and member of the homecoming king's court. Gasior and Carpenter never asked the police officers involved in the Operation to verify that the yearbook photograph was of the correct suspect. It was that photograph of plaintiff that was ultimately published in the *Herald* in connection with the arrest of Christopher A. Edwards on felony drug charges.

As the impending arrest date approached, the police were assembling documents needed to assist the arresting officers. Elizabeth Calhane, an intelligence analyst for the Illinois State Police, testified that it was her responsibility to prepare an intelligence data sheet on each criminal suspect as the Operation unfolded. In addition to information regarding the suspect's name, address, and other vital statistics, the data sheet included a space for a photograph. These data sheets were not public records. Included at the bottom of the sheet was a disclaimer, "—NOT FOR DISSEMINATION—."

Calhane testified that on March 25, 1991, in anticipation of a briefing to be held the following day, she prepared the intelligence data sheets for all 32 suspects, including a data sheet for Christopher

A. Edwards which contained his photograph. She then compiled a packet of information concerning each suspect, referred to at trial as an arrest packet. Additionally, she may have compiled a packet of data sheets for all 32 suspects, referred to as an informational packet, but did not recall doing it. While Calhane testified that she did not prepare a data sheet with plaintiff's photograph on it, and that nothing left her office with plaintiff's photograph on it, she did not know what happened to the documents she prepared after she gave them to her supervisor, Captain Robert Johnson of the Illinois State Police.

In assembling information, Officer Michael Hish of the Hoffman Estates police department testified that on March 11, 1991, he took a photograph of Christopher A. Edwards when he came to the station to file a battery complaint. Hish sent that photograph to the Illinois State Police. While Hish had previously stated under oath that someone from the Hoffman Estates police department had also sent the State Police a yearbook photograph of plaintiff, he had no independent recollection of that at trial.

In the early morning hours of March 26, 1991, a prearrest meeting was held at the Schaumburg police department where the leaders of Operation Erinnyes briefed the teams of field officers who would be making arrests later in the day. Much of the testimony at trial revolved around determining who was present at that briefing, what information was disseminated there, and to whom it was disseminated. The testimony was conflicting and involved the admission into evidence of several documents, most of which were not provided to this court in the record on appeal.

Gasior testified that she was present at that briefing and received an informational packet from one of four officers: Robert Johnson, Clifford Johnson, Robert Stachnik or Michael Hish. According to Gasior, the packet she received included a data sheet for Christopher A. Edwards which mistakenly included plaintiff's yearbook photograph. She denied receiving a data sheet with a photograph of Christopher A. Edwards. John Carpenter testified that he was also present at the prearrest briefing and was handed an informational packet from one of three officers, Michael Callahan, Robert Stachnik or Michael Hish. Gasior and Carpenter testified that, as they perused the packet, they both recognized the photograph on Christopher A. Edwards' data sheet as the one Carpenter had previously found in the Hoffman Estates High School yearbook which listed a Christopher Edwards with no middle initial. They assumed that the information provided to them from the police was accurate.

No other witness could corroborate their testimony that they received a data sheet with plaintiff's photograph on it. Several other

reporters testified that they had a one-time assignment to cover the arrests on March 26, 1991, and attended the briefing with Gasior and Carpenter. While they all denied receiving a data sheet with a photograph of plaintiff on it, Danielle Kapolnek stated that she saw Gasior with data sheets of the suspects.

Captain Robert Johnson testified that he was aware that reporters from the *Herald* were involved in the operation, but he did not know whether the reporters were at the briefing or whether they got any documents at the meeting. He further testified that he did not authorize the distribution of the data sheets to the reporters and, to the best of his recollection, the informational packages did not contain a photograph of plaintiff. Officer Michale Callahan, the primary undercover investigator for the Operation, testified that he was present at the prearrest briefing and did not review the packets, did not disseminate any materials at the meeting, and did not know whether they were handed out to the reporters. After being shown a data sheet with a photograph of Christopher A. Edwards on it at trial, he stated that, while he had no personal knowledge of the origin of that photograph, he believed the photograph was provided by Detective Michael Hish from the Hoffman Estates police department. Hish had told him that he had finally gotten a photograph of Christopher Edwards when he came into the police station to file a battery complaint.

Captain Clifford Johnson of the Schaumburg police department testified that he was also present at the briefing and that the reporters from the *Herald* were invited to participate in that briefing. He recalled that informational packets were handed out to the reporters. While Johnson acknowledged that the primary authority for the operation rested with the Illinois State Police, he stated that he authorized the reporters to use the material in the reporting of their story. While he did not personally disseminate the packets and did not recall who did disseminate them, he believed that he saw Gasior get a copy of an informational packet. However, he could not identify particular documents that were included in the materials that were handed out and did not know whether the data sheet with plaintiff's photograph was one of the documents available at the briefing. Detective Robert Stachnik testified that he was present at the briefing. He did not know whether the reporters were at the briefing or if they received materials.

After the briefing, Gasior accompanied the police to the arrest of Christopher A. Edwards. As she sat in the back or front seat of a car, she saw the arrest team bring Edwards out of a house. He was placed in the car in front of her, but she testified that she could not see him closely enough to identify him. Police arrested 25 of the 32 suspects.

After the arrests, the reporters returned to their offices to complete their articles, which were to be published the next day. While they had prewritten much of the information, as was common practice, once the arrests were made, they eliminated references that did not comport with what had actually occurred. According to the reporters, references to those that had not been actually arrested were deleted.

On that same day, a photographer from the *Herald* took an arrest photograph of Christopher A. Edwards. Neither Gasior nor Carpenter recalled seeing the arrest photograph and Thomas Grieger, the director of photography, testified that the reporters and editors would not be involved in the initial photographic selection process.

The next day, the *Herald* published a number of articles concerning the arrests made in connection with Operation Erinnyes. As part of the series of articles, they published a photograph of plaintiff, taken from his high school yearbook. The heading above plaintiff's photograph read "Targets of Operation Erinnyes," and the caption alongside the photograph indicated that "Chris Edwards" was "[a] former Hoffman Estates High School football star" and that he was charged with "[f]our counts of delivery of a controlled substance—all Class X felonies with mandatory 6- to 30-year jail terms, if convicted." The caption further stated that "[u]ndercover police dealt regularly with Edwards and his associates." The body of the article reports that "Edwards was a star high school football player, captain of the team and a member of the homecoming king's court," and further reports that he was "doing business with the Black Gangster Disciples."

Gasior and Carpenter testified that they learned of the error on the morning of the publication. Gasior stated, "We got an important fact wrong because we couldn't have checked it prior to that time and we relied on the information given us from the police just as we do every day." Carpenter acknowledged that there was nothing that prevented him from getting additional background information on the suspects after the arrest other than the demands on his time. After the misprint, they testified that they confirmed with Lampinen that the picture of plaintiff appeared on the data sheet they had received at the briefing. Gasior did not present her copy of the data sheet at trial.

After being notified of the misidentification, Robert Johnson reviewed the files of the Illinois State Police and never saw a photograph of plaintiff in the file. Clifford Johnson testified that, after being notified by Gasior that the wrong photograph had been published in the paper, he asked Investigator Stachnik to investigate the matter. While he previously stated under oath that he did not recall specifically learning that an incorrect photograph was attached to an intelligence data sheet prior to March 28, 1991, he testified at

trial that the day after the briefing he was shown a data sheet for Christopher A. Edwards with a photograph of plaintiff. Stachnik testified that he became aware of the misidentification the day after the arrests. He did not recall if he examined the Schaumburg files to determine if plaintiff's photograph appeared in the informational packet. After being shown a data sheet for Christopher A. Edwards at trial with writing indicating "wrong photo," Stachnik acknowledged that it was his handwriting and that he placed the writing on the document sometime after the mistake had been discovered. He did not recall when he did that or where he found the document that he marked. He did not recall whether the document was from his files or from "one of the extras laying [sic] around" or from Clifford Johnson. He acknowledged that he had no recollection of seeing plaintiff's photograph on a data sheet at any time prior to or during the prearrest briefing.

On March 28, 1991, the *Herald* printed a front-page retraction of the story advising readers of the incorrect identification in the previous day's paper. The article explained that plaintiff attended Southern Illinois University, was on the dean's list and the football team, and was not associated in any way with the arrest of Christopher A. Edwards, another former Hoffman Estates High School student with the same name.

Thereafter, in 1992, plaintiff filed his complaint against defendants asserting claims of negligence, defamation based upon actual malice, and false light. He sought compensatory and punitive damages in connection with the defamation claim. At the close of plaintiff's case and after an initial defense witness testified, the trial court directed a verdict for all defendants on the negligence count for failure to introduce evidence that defendants deviated from journalistic practices, which the court found to be "outside the ken of the normal juror." The court also granted a directed verdict on all counts as to the editor defendants because plaintiff failed to introduce evidence of actual malice. In answering a special interrogatory, the jury rejected defendants' contention that Gasior and Carpenter received misinformation from the police. The jury returned a general verdict for the remaining defendants on the remaining counts.

ANALYSIS

■ Plaintiff initially contends that the trial court erred in directing a verdict for defendants on the negligence count. After the close of plaintiff's case, the trial court found that plaintiff had failed to present evidence concerning the duty of care of a journalist and that the duty of a journalist was "outside the ken of the normal juror or an ev-

eryday citizen." Defendants maintain that the trial court's ruling was proper because plaintiff was required to present evidence, expert or otherwise, of recognized journalistic standards or practices. We review the trial court's ruling on a motion for a directed verdict *de novo*. *Gathings v. Muscadin*, 318 Ill. App. 3d 1091, 1093, 743 N.E.2d 659, 660 (2001).

■ The supreme court long ago determined that, in defamation cases involving a private individual against a media defendant, the conduct of the media defendant is to be measured under an ordinary negligence standard. *Troman v. Wood*, 62 Ill. 2d 184, 198, 340 N.E.2d 292, 299 (1975). Under such a standard, plaintiff need only establish that defendant failed to act as a reasonably careful person would act under the same or similar circumstances. In making its determination, the *Troman* court unequivocally rejected a "journalistic malpractice" standard under which negligence would be determined by a departure from the prevailing newspaper standards or custom and practice in a community. 62 Ill. 2d at 197-98, 340 N.E.2d at 298-99. To do so would risk the progressive depreciation of the standard of care. *Troman*, 62 Ill. 2d at 198, 340 N.E.2d at 299.

■ Additionally, whether defendants exercised due care in gathering the factual information for their newspaper article is not a technical matter outside the ken of a lay juror that would require expert testimony. While defendants are not precluded from introducing expert testimony regarding the customs and practices or standards of the journalism profession (see *Demos v. Ferris-Shell Oil Co.*, 317 Ill. App. 3d 41, 54, 740 N.E.2d 9, 19 (2000)), plaintiff is not required to present expert opinion testimony to establish that a media defendant breached the duty of ordinary care. See *Troman*, 62 Ill. 2d at 197-99, 340 N.E.2d at 298-99. Accord *Gannett Co. v. Kanaga*, 750 A.2d 1174 (Del. 2000); *Kohn v. West Hawaii Today, Inc.*, 65 Haw. 584, 656 P.2d 79 (1982); *Schrottman v. Barnicle*, 386 Mass. 627, 437 N.E.2d 205 (1982); *Greenberg v. CBS Inc.*, 69 A.D.2d 693, 419 N.Y.S.2d 988 (1979).

■ Thus, we must determine if the directed verdict was improper under an ordinary negligence standard. A directed verdict should not be rendered where "there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512 (1992). Viewing the evidence in the light most favorable to the plaintiff, we find that he presented a question for the jury as to whether defendants breached the standard of ordinary care in printing the false information. Plaintiff introduced testimony that

defendants failed to investigate that the photograph they obtained from the yearbook was in fact a photograph of the correct suspect. There were also several credibility determinations to be made by the jury, including Gasior's ability to observe the correct suspect prior to the publication of the article and whether the reporters received the misidentified information from the police. If the jury chose to believe that the police were not the source of the misidentified information, there was sufficient evidence to support a finding of negligence. Accordingly, we must reverse the trial court's ruling on the negligence count and remand for a new trial on that issue.

■ Next, plaintiff contends that the trial court erred in allowing defendants to present a fair report privilege to the jury because the privilege is not applicable under the facts presented. The evidence admitted at trial was that, in preparing their newspaper account of the arrests, the reporters relied upon the misinformation contained in an Illinois State Police intelligence data sheet for Christopher A. Edwards which included a photograph of plaintiff. Section 611 of the Restatement (Second) of Torts defines the fair report privilege as follows:

"The publication of defamatory matter concerning another in a report of an official action or proceeding *** is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts § 611, at 297 (1977).

This section was adopted by the Illinois Supreme Court in *Catalano v. Pechous*, 83 Ill. 2d 146, 167-68, 419 N.E.2d 350, 360-61 (1980). Under the privilege, the news media may reprint defamatory information reported by another in the context of public records or proceedings. *Catalano*, 83 Ill. 2d at 167, 419 N.E.2d at 360. In addition, it has also been said that the privilege protects news accounts based upon the written and verbal statements of governmental agencies and officials made in their official capacities. *Tepper v. Copley Press, Inc.*, 308 Ill. App. 3d 713, 717, 721 N.E.2d 669, 673 (1999). However, for the privilege to apply, the news media is obligated to summarize the defamatory matter in a fair and accurate manner. *Berkos v. National Broadcasting Co.*, 161 Ill. App. 3d 476, 491-92, 515 N.E.2d 668, 677 (1987). If the defamatory matter does not appear in the official record or proceedings, the privilege of fair and accurate reporting does not apply. *Berkos*, 161 Ill. App. 3d at 492, 515 N.E.2d at 677. This assessment is made by comparing the official reports with the news media account. *Dolatowski v. Life Printing & Publishing Co.*, 197 Ill. App. 3d 23, 27, 554 N.E.2d 692, 694 (1990).

■ While we have found no case that supports defendants' contention that the data sheet constitutes an "official act or proceeding," we

need not determine that issue because we find that the news media account is not an accurate summary of the information allegedly provided to the *Herald* reporters. The news account reported that Christopher Edwards (erroneously picturing the plaintiff) was arrested and charged with four counts of delivery of a controlled substance. Nowhere in the intelligence data sheet is it reported that plaintiff was arrested and charged with those crimes. Indeed, the testimony at trial was that the data sheets were not for dissemination to the public, were prepared as an aid to officers in identifying criminal suspects to be arrested at a later time, and were specifically disseminated as prearrest materials. The *Herald* did not accurately summarize the information allegedly provided by police; instead, it published information never reported in the data sheets. Accordingly, on remand defendants are not entitled to present the fair report privilege to the jury.

■ Next, we address plaintiff's contention that the trial court erred in submitting defendant's reckless disregard instruction to the jury over his tendered versions of the instruction. Plaintiff sought to define reckless disregard to include a failure to investigate or a lack of reasonable basis to believe the truth of the statements published. Instead, the jury received defendants' instruction, which included the statement that reckless disregard requires more than a failure to investigate. The trial court has discretion to determine which jury instructions should be given and, absent abuse, its decision will not be disturbed on appeal. *Eaves v. Hyster Co.*, 244 Ill. App. 3d 260, 262, 614 N.E.2d 214, 216 (1993). The test to determine the adequacy of a jury instruction is whether it fairly and accurately states the law. *Nilsson v. NBD Bank of Illinois*, 313 Ill. App. 3d 751, 759, 731 N.E.2d 774, 780-81 (1999).

■ Defendant argues that the instruction given is nearly a verbatim quote from *Troman* and is simple, brief, impartial, and free of argument as required when using a non-pattern jury instruction. Defendant is correct that a "reckless disregard" for the truth requires more than a departure from reasonably prudent conduct, and the court in *Troman* specifically stated that it "meant more than a failure to investigate." *Troman*, 62 Ill. 2d at 190, 340 N.E.2d at 295. In *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 105 L. Ed. 2d 562, 589, 109 S. Ct. 2678, 2696 (1989), the United States Supreme Court again confirmed that there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication or that defendant published the matter despite a high degree of awareness of probable falsity. *St. Amant v. Thompson*, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S.

Ct. 1323, 1325 (1968); *Mittelman v. Witous*, 135 Ill. 2d 220, 237, 552 N.E.2d 973, 981 (1989) (abrogated on other grounds by *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 619 N.E.2d 129 (1993)). As a result, the failure to investigate before publishing, even when a reasonably prudent person would have done so, is generally not sufficient to establish reckless disregard. *Harte-Hawkins*, 491 U.S. at 688, 105 L. Ed. 2d at 589, 109 S. Ct. at 2696; *Troman*, 62 Ill. 2d at 190, 340 N.E.2d at 295.

However, despite the holding in *Troman*, a defendant's fact-gathering abilities may "raise the spectre of reckless disregard when their use has revealed either insufficient information to support the allegations in good faith or information which creates substantial doubt as to the truth of published allegations." *Wanless v. Rothballer*, 115 Ill. 2d 158, 172, 503 N.E.2d 316, 322 (1986). When the defendant is the original source of the defamatory information and relies merely upon inferences drawn from certain events, reckless disregard may be shown where the defendant failed to make inquiry to ascertain whether the inferences drawn were correct where there are other inferences that may have been drawn from the same events. *Catalano*, 83 Ill. 2d at 166, 419 N.E.2d at 360. In such a situation, there would be obvious reasons to doubt the truth of the defendant's statement, and the jury would be entitled to a failure to investigate instruction.

In *Catalano*, the defendant falsely stated that certain aldermen took bribes in connection with the awarding of a garbage collection contract. The defendant had no personal knowledge of the alleged bribery, had not been informed of it by another person, had no documentary evidence of a bribery, and did not attempt to verify his statement other than the information he gleaned from the minutes of a city council meeting. Based upon these facts, the court concluded that the basis for his charge of bribery was an inference which he drew solely from the manner in which the award was made. The court held that defendant's failure to make an inquiry to ascertain whether his inference was the correct one to draw constituted reckless disregard where other inferences could have been drawn as to the cause of the award. *Catalano*, 83 Ill. 2d at 165-67, 419 N.E.2d at 359-60.

■ Similarly, in the present case there was evidence presented at trial that defendants had no personal knowledge that plaintiff was arrested, that they did not receive the defamatory information from the police, and had no documentary evidence that the plaintiff was arrested. Based upon these facts, the jury could have concluded that the reporters made the inference that plaintiff was the individual arrested merely based upon information they gleaned from a yearbook, and failed to verify that those inferences were the correct inferences where

the yearbook also indicated that plaintiff was a star athlete and a member of the homecoming court.

Litigants are entitled to have the jury instructed on the legal principles applicable to the facts of the case. *Nilsson*, 313 Ill. App. 3d at 759, 731 N.E.2d at 780. Accordingly, if the jury found defendants were the source of the misidentified information, which indeed it found, then plaintiff was entitled to an instruction, tracking the language of *Catalano*, that a failure to inquire into the truth of one's own inference could constitute reckless disregard where there is substantial reason to doubt the truth of that inference. Accordingly, because the jury instruction that reckless disregard requires more than a failure to investigate did not form a clear and adequate picture of the applicable law as it applied to the facts in this case, we reverse and remand for a new trial on actual malice including plaintiff's false light claim. We note that on retrial the appropriate instruction will depend upon the evidence presented at the new trial.

■ Additionally, we find that on remand plaintiff shall be entitled to amend his complaint to allege punitive damages for false light. Evidence sufficient to establish actual malice on the part of a defendant entitles a plaintiff in an action for false light to have his request for punitive damages considered by the trier of fact. *Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill. App. 3d 731, 748, 728 N.E.2d 547, 561 (2000).

■ In light of our holding, we need only address plaintiff's additional contentions which may potentially arise on retrial. Plaintiff contends that it was erroneous for the trial court to admit the Illinois State Police data sheet bearing a photograph of plaintiff where defendants failed to present a sufficient foundation for the document. Gasior and Carpenter both testified that they received the data sheet or an exact copy of it at the prearrest briefing, and Officer Clifford Johnson testified that he saw Gasior with documents at the briefing. While the reporters were unable to specifically identify who gave them the document, and no police officer admitted to distributing the document to the reporters, the lack of corroboration goes to the weight to be accorded such evidence rather than its admissibility.

■ Additionally, we reject plaintiff's contention that the trial court erred in directing a verdict for defendant editors Lampinen, Rudolph and Ray on the actual malice and false light counts where there was no evidence presented to the jury that the editors knew the information was false or that they in fact entertained serious doubts as to the accuracy of the information. Nor do we find merit in plaintiff's argument that defendants elicited undisclosed opinion testimony from Gasior on journalistic standards of care in violation of Supreme Court

Rule 213. 177 Ill. 2d R. 213. Her testimony that her story was fair, balanced and accurate was stricken by the court and cured any alleged error. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 535-36, 736 N.E.2d 1074, 1091 (2000). Furthermore, the second complained-of statement, referring to accurate and fair reporting, was merely an explanation of the policies in place at the newspapers where she was employed.

Accordingly, for the foregoing reasons, the judgment of the circuit court is reversed and remanded for a new trial consistent with this opinion.

Reversed and remanded.

HOFFMAN, P.J., and HARTMAN, J., concur.