(No. 92238

ROSS WAYNE EVANS *et al.*, Indiv. and Co-Adm'rs of the Estate of Timothy Michael Evans, Deceased, Appellees, v. DERRICK SHANNON *et al.* (Vogler Motor Company, Inc., Appellant).

*Opinion filed August 29, 2002.*

Stephen L. Corn, Richard F. Record, Jr., John F. Watson and R. Sean Hocking, of Craig & Craig, of Mattoon, for appellant.

R. Courtney Hughes, of Hughes & Prince, of Carbondale, for appellees.

CHIEF JUSTICE HARRISON delivered the opinion of the court:

Timothy Evans died as a result of injuries he sustained when his vehicle collided with a car negligently driven by defendant Derrick Shannon. The car Shannon was driving at the time of the accident, a Mercury Sable station wagon, was owned by defendant Vogler Motor Company and had been entrusted the previous day to defendant Robert Margrum, doing business as Bob's Clean Up Shop, for detailing and cleaning services. Shannon, acting in his capacity as Margrum's employee, had taken possession of the Vogler vehicle and had driven it to Margrum's place of business, wherein the car was locked up for the night. At some point that evening, after regular business hours, Shannon returned to the shop and, without authority, took the car for his own use. He was intoxicated and driving the vehicle when he crossed the centerline of the highway and collided with Timothy Evans' car. Shannon did not have a valid driver's license at the time of the collision.

The parents of Timothy Evans brought wrongful-death and survivor actions, as co-administrators of the estate of Timothy Evans and individually. Plaintiffs' action against Vogler was based in pertinent part on a theory of negligent entrustment of Vogler's car to Derrick Shannon, Margrum's employee. A jury ultimately found all three defendants liable, but found Vogler only

9% liable. Initially, the circuit court entered judgment on the verdict and granted *several* liability as to Vogler, based upon the percentage of negligence attributed to Vogler by the jury. However, after a motion for reconsideration, the circuit court entered *joint* liability as to all defendants. Noting that this court in *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997), had held section 2—1117 of the Code of Civil Procedure (Code) (735 ILCS 5/2—1117 (West 1996) (amended by Public Act 89—7, eff. March 9, 1995)) unconstitutional, the circuit court ruled that the *prior* version of the statute (735 ILCS 5/2—1117 (West 1994) (providing for *several* liability if degree of fault is determined to be less than 25% and *joint and several* liability if the degree of fault is determined to be 25% or more)) was unconstitutional as well, finding that it arbitrarily establishes "different types of liability solely dependent upon the percentage of fault," attributed to individual defendants and "is contrary to the common law of this state as interpreted by the Supreme Court of Illinois."

From the circuit court's ruling, Vogler brought this direct appeal pursuant to Supreme Court Rule 302(a)(1) (134 Ill. 2d R. 302(a)(1)). Because we find that Vogler's motions for directed verdict and judgment notwithstanding the verdict were improperly denied, we reverse the judgment of the circuit court as it pertains to Vogler and remand this cause for assessment of damages against only Shannon and Margrum. Thus, we need not reach the constitutional issue in this case. We set forth below a brief statement of the applicable standards of review and the pertinent facts.

A denial of a motion for judgment notwithstanding the verdict, like an adverse ruling on a motion for directed verdict, is reviewed under the *de novo* standard. *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 89 (2002); *Edwards v. Paddock Publications, Inc.*,

327 Ill. App. 3d 553, 562 (2001). "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill. 2d 494, 510 (1967). See also *Donaldson,* 199 Ill. 2d at 89; *Maple v. Gustafson,* 151 Ill. 2d 445, 453 (1992).

Following is a comprehensive summary of the trial testimony we consider pertinent to the issue of negligent entrustment. Consistent with applicable standards of review, we have taken care to include even marginal evidence favorable to the plaintiffs, and that which is arguably relevant.

Dennis Rathjen, vice-president and sales manager of Vogler, testified that Vogler had utilized the services of Margrum's business for a number of years and had never had any problems with his work. Prior to the March 5, 1996, collision, Rathjen had perceived Margrum as a reputable business owner who hired only reputable employees. Before March of 1996, Vogler had never had a car stolen while in Margrum's possession, nor had a Vogler vehicle been involved in a collision. Based upon their relationship up to that point in time, Vogler's management trusted Margrum.

Rathjen testified that, as a matter of policy, Vogler allowed only licensed drivers to operate its cars. Rathjen assumed that Margrum had performed background checks on his employees and had verified that they had driver's licenses. Rathjen considered that *Margrum's* responsibility. Vogler personnel did not ask to see the licenses of Margrum's employees when they came to pick up Vogler's cars. Had Rathjen known Margrum was using unlicensed drivers, it would have been cause to terminate their business relationship. Rathjen conceded it would have taken "about five seconds" to verify that

Margrum's drivers were licensed when they came to get Vogler's cars. Rathjen *supposed* Vogler would have had the authority to ask for verification of a valid license had it chosen to do so. The procedure in place, however, merely required that an inventory sheet show which Vogler employee had provided Margrum's employee the keys for the car to be detailed.

Rathjen was aware of one instance when a Margrum employee (Jerome Wooley) was seen in a Vogler car at the drive-up window of the ABC Liquor Store in Carbondale, Illinois (the municipality in which both businesses were located); however, Rathjen said he would not have complained to Margrum, as the detour was at most 50 yards off the route from Vogler to Margrum's business and the employee in question was purportedly only buying cigarettes.

Frank Black, Vogler's president and majority stockholder, testified there was no policy in place to check Margrum's employees for driver's licenses. He felt that was Margrum's responsibility. Black said he expected Margrum to check out his employees, "[s]ame as any other contractor I do business with." In that respect, Black rejected plaintiffs' counsel's attempt to differentiate between a large business, like K mart, and a small business, like Margrum's. Before the accident that gave rise to this case, Black had never heard of any cars having been stolen from Margrum's shop, nor of any cars in his possession having been involved in a collision or having been driven recklessly. Black testified that a log sheet would have noted the location of a Vogler vehicle and would have indicated who was in possession of it. Vogler on occasion used other detailers, and Margrum performed services for individuals and businesses other than Vogler.

Black denied knowing about "detours" that might have been taken with Vogler's cars while in Margrum's possession. Asked, hypothetically, what action he might

have taken had he known about detours, Black responded that he probably would have said something to Margrum about it, and he might even have terminated the business relationship with Margrum if the detours were "severe enough."

John Barnes, a salesman for Vogler, testified that he recalled someone at Vogler had arranged for detailing the Sable station wagon through Bob's Clean Up Shop. On March 4, 1996, someone from Bob's arrived to pick up the car. Barnes recalled hearing someone say that "Bob's" was there to get the car. Barnes did not see Bob personally come into Vogler's building or pull up outside. Barnes handed the keys to a man he did not know and subsequently learned was Margrum's employee Derrick Shannon. Barnes did not really look at the man's face or speak to him. Barnes simply handed him the keys and pointed to the car. The man had what appeared to be dealer plates under his arm. The man did not offer identification and Barnes did not ask for any. Prior to March of 1996, according to his own estimate, Barnes had handed over keys more than 100 times to Margrum's employees without ever having asked to see a driver's license.

Barnes admitted it would have violated Vogler's unwritten policy for Shannon to have driven the car without a valid driver's license. He conceded he would not have handed the keys to Shannon had he known Shannon did not have a driver's license. He stated his belief that he lacked the authority to ask Margrum's employees for license verification.

Barnes testified that he had been instructed by Rathjen to investigate the ABC Liquor Store incident. He spoke with Margrum, who informed Barnes that the employee in question was "no longer with him." Barnes testified that he did not trust Margrum or his employees completely after that incident. In fact, Barnes subse-

quently took it upon himself to check odometer readings on Vogler cars returned by Margrum; however, prior to the accident, he did not find excess miles on cars that had been sent to Margrum for detailing.

Jerry Bankhead testified that he was working for Margrum in March of 1996. When he was hired, he was not required to produce a driver's license or fill out a job application. He was aware of no background check undertaken by Margrum in his case.

Margrum had a rule that only an employee with a valid driver's license could drive dealer cars. He told his employees that the car dealers with whom he dealt required a driver's license. Margrum also warned employees about putting excess miles on cars. Bankhead stated that one employee, Singletary Johnson, had been fired because he violated the latter rule. Bankhead said that Jerome Wooley was fired as a result of the ABC Liquor Store incident, but was later rehired.

Bankhead was a friend of Derrick Shannon, with whom he worked for approximately 2$^1$/$_2$ months. Bankhead testified that Shannon had a key to the front door of Margrum's shop because Shannon usually got to work early. Margrum's shop held about eight cars. Sometimes cars were parked outside overnight, but the keys to those cars were locked up inside. As for vehicles parked inside overnight, their keys were sometimes locked away, and sometimes they were not. During the years that Bankhead worked for Margrum, at least prior to March of 1996, no cars were ever stolen from Margrum's shop.

According to Bankhead, on the afternoon of March 4, 1996, Bankhead, Margrum and Shannon went to Vogler's place of business to pick up a Mercury Sable station wagon. Margrum drove; Shannon went inside and came out with the keys. Margrum and Bankhead then followed Shannon back to Margrum's shop, with Shannon driving the Sable. When they got to the shop, they moved a

couple of cars so they could put the station wagon inside. Margrum then told Shannon to lock up, and Bankhead saw the doors coming down as he and Margrum drove away. As far as Bankhead knew, Margrum had not assigned anyone to work on the Sable.

Bankhead testified that he had been with Shannon several times before when they had walked into Vogler's building to pick up a car. John Barnes had always handed them the keys and had never asked to see a driver's license. Bankhead believed that people at Vogler recognized them as Margrum's employees.

Jerome Wooley testified that he worked for Margrum, detailing cars, between 1992 and February of 1996. Wooley is Margrum's second cousin. As far as Wooley was aware, when he was hired, Margrum never checked his references or inquired about any criminal history.

There was a period of time when he worked for Margrum that Wooley's driver's license had expired. Margrum was aware of his license status, yet Wooley still picked up cars from Vogler. No one at Vogler ever asked to see his driver's license. Like Shannon, Wooley had keys to the shop. Wooley denied involvement in the ABC Liquor Store incident.

Defendant Robert Margrum was called by the plaintiffs to testify. Margrum stated that he thought Vogler had a sign-out sheet that his employees would sign when they picked up the keys to a car. Responding to a series of hypothetical questions from plaintiffs' counsel, Margrum affirmed that he would have secured keys to Vogler vehicles inside the shop if Vogler had asked him to, he would have done background checks on his employees if Vogler had asked, and he would have checked driver's licenses of employees who drove Vogler cars. As far as Margrum was aware, Vogler never checked the license status of his employees before they drove Vogler cars. Margrum did not know, prior to March of 1996, that

Shannon had a criminal history and a record of traffic violations, because Margrum had not conducted a background check on Shannon before he hired him.

Margrum at first testified that he knew Shannon did not have a valid driver's license; consequently, Shannon was not allowed to pick up and drive dealership cars. He claimed he would not have hired Shannon had he initially known about his license status. Even though Shannon did not have a valid driver's license, Margrum gave him a key to the shop.

Margrum testified that March 4, 1996, was the first time that Shannon had gone to Vogler to pick up a car. Margrum maintained that Shannon should not have gone to Vogler's dealership to pick up the Sable station wagon. Shortly after giving that testimony, Margrum admitted that *he* probably had driven Shannon to Vogler to pick up the car, as Bankhead had earlier testified. He conceded that he really did not remember, but would not disagree with Bankhead's testimony.

Addressing the ABC Liquor Store incident, Margrum testified that he fired Wooley after Barnes complained, even though Wooley claimed he was only getting a pack of cigarettes and the deviation from the normal route was slight. Margrum said he later rehired Wooley. He was unaware that Wooley did not have a valid driver's license.

On cross-examination, Margrum testified he gave a garage key to any employee who wanted to come in early for work. Keys to the vehicles were readily available inside the shop so that cars could be moved around during the course of the day. Although Margrum did not remember taking Shannon to pick up the Sable on the day in question, he did recall checking the shop later that evening around 7 p.m. The Sable was there and the door to the shop was locked. Margrum noticed the Sable was missing the next morning when he opened up.

According to Margrum, in the 10 years he was in business, employees deviated from a direct route perhaps six or seven times. Before March 4, 1996, he had never had a car stolen. As far as Margrum was aware, no one at Vogler knew that Shannon was unlicensed or that Margrum did not conduct background checks on his employees.

We find the foregoing evidence insufficient to support a verdict in favor of plaintiffs on their negligent-entrustment claim against Vogler. The verdict against Vogler cannot stand.

In order to prove negligent entrustment, plaintiffs must show that Vogler gave another express or implied permission to use or possess a dangerous article or instrumentality which Vogler knew, or should have known, would likely be used in a manner involving an unreasonable risk of harm to others. See *Norskog v. Pfiel*, 197 Ill. 2d 60, 84-85 (2001); *Zedella v. Gibson*, 165 Ill. 2d 181, 186 (1995); see Restatement (Second) of Torts § 308 (1965). Although an automobile is not a dangerous instrumentality *per se*, it may become one if it is operated by someone who is incompetent, inexperienced or reckless. *Eyrich v. Estate of Waldemar*, 327 Ill. App. 3d 1095, 1098 (2002).

There are two primary considerations in negligent-entrustment analysis: (1) whether the owner of the vehicle entrusted the car to an incompetent or unfit driver, and (2) whether the incompetency was a proximate cause of a plaintiff's injury. *Taitt v. Robinson*, 266 Ill. App. 3d 130, 132 (1994). In turn, proximate cause consists of two distinct elements: cause in fact and legal cause. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-58 (1999); see *Watson v. Enterprise Leasing Co.*, 325 Ill. App. 3d 914, 922 (2001). As this court stated in *First Springfield Bank & Trust*:

"Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage. [Cita-

tion.] A defendant's conduct is a cause in fact of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury. [Citation.] A defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred. [Citation.] 'Legal cause,' by contrast, is essentially a question of foreseeability. [Citation.] The relevant inquiry here is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *First Springfield Bank & Trust*, 188 Ill. 2d at 258.

With these precepts in mind, we first address the contention that Vogler personnel knew, or should have known, that Shannon was an unlicensed or incompetent driver when Barnes handed him the keys to the Sable. Vogler may be charged with knowledge of six or seven "detours" with its vehicles while they were in Margrum's possession, over a period of several years. One of those detours, the ABC Liquor Store incident, involved a detour off the appointed path of perhaps 50 yards for the stated purpose of purchasing cigarettes. Vogler employees may also have known of significant turnover of employees at Margrum's business. These facts fall far short of establishing that, on March 4, 1996, Vogler either knew, or had reason to know, that any of Margrum's drivers were unlicensed, incompetent or reckless. The incidents upon which plaintiffs rely have no bearing whatsoever upon the safe operation of a motor vehicle.

All of the information at Vogler's disposal indicated that Vogler vehicles were safe while in Margrum's possession. During the years that Vogler had utilized Margrum's services, Vogler had never had a vehicle stolen or involved in a collision. Moreover, Vogler management was aware that other dealerships also used Margrum to detail and clean up their cars, evincing their trust in Margrum.

Plaintiffs, however, suggest that Vogler had an additional duty to check Shannon's driver's license status,

relying principally upon *Small v. St. Francis Hospital*, 220 Ill. App. 3d 537 (1991). In *Small*, the defendant dealership sold a car to Alexander Shlepakov, a 15-year-old boy who did not possess a driver's license. Less than a month after the sale, Shlepakov struck and killed Rene Roughny with the car he had purchased from defendant. The executor of Roughny's estate brought suit against the defendant dealership under a negligent entrustment theory, alleging that defendant had sold the car to Shlepakov without inquiring as to his identification, age, or training to operate a vehicle. The circuit court granted defendant's motion to dismiss for failure to state a cause of action. The appellate court reversed and remanded, concluding, "when a car seller has reason to know that a prospective buyer is *underage*, unlicensed, or otherwise incompetent, a cause of action for negligent entrustment exists." (Emphasis added.) *Small*, 220 Ill. App. 3d at 542. The *Small* court emphasized:

> "[O]ur holding does not require that a seller of a car, whether commercial or private, must ask for a driver's license or investigate driving proficiency in every case ***." *Small*, 220 Ill. App. 3d at 542.

Although we do not question the holding in *Small*, we see no reason to extend it to this context given the facts of the instant case. This was a service transaction between two business entities and Vogler neither knew nor had reason to know that Shannon was unlicensed or otherwise incompetent to operate a motor vehicle. In *Small*, the car dealer sold a vehicle to a 15-year-old whose appearance alone might have put the dealer on notice that he was inexperienced and unlicensed. In this case, there was nothing which would have red-flagged Shannon as an unlicensed, incompetent or reckless driver. Quite the contrary, Bankhead testified that he and Shannon had been to Vogler's place of business several times to pick up vehicles. Those vehicles were apparently returned to Vogler without incident. Moreover, Shannon

was employed by Margrum, with whom Vogler had dealt for many years without experiencing any safety-related problems. In handing the keys to Shannon, Barnes, on behalf of Vogler, entrusted the car to Margrum and the business that he operated. In so doing, Vogler entrusted its car to an independent contractor, much the same as the car dealer in *Jones v. Beker*, 260 Ill. App. 3d 481 (1994), entrusted *its* cars to an independent contractor for repossession, much the same as millions of people do every year when they take their cars to auto service facilities or dealerships for servicing and repairs. Although an unknown mechanic may drive away in the customer's vehicle, he or she would not think of asking the mechanic to produce a driver's license. Customers assume that the responsibility to see that the mechanic-employee is licensed lies with his or her employer, the independent contractor they have retained to perform the service. They are entrusting the vehicle to the contractor. We hold, unless a customer knows, or has reason to know, that an employee of the contractor is unlicensed, incompetent or reckless, the customer has no duty of further inquiry.

In *Washington v. City of Chicago*, 188 Ill. 2d 235 (1999), we discussed the criteria for determining whether a duty exists:

"In resolving whether a duty exists, a court must determine whether there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of the other. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 227 (1996). The factors relevant to the courts' imposition of a duty include the reasonable foreseeability of injury, the likelihood of such injury, the magnitude of guarding against the injury, and the consequences of placing that burden on the defendant. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 425 (1998)." *Washington*, 188 Ill. 2d at 239.

Having considered all of the above factors, and in particular the consequences of imposing this additional

burden of inquiry upon the entrustor of an automobile, we hold that the relationship between these parties does not require the imposition of a general legal obligation to check the driver's license of an employee of an independent contractor to whom one entrusts one's vehicle, barring some reason to know that the employee may be incompetent to operate that vehicle. A duty so imposed would have far-reaching consequences, logically extending to every person who takes his or her vehicle for repair or servicing, and requiring that commercial and private car owners alike police the hiring practices of businesses with whom they deal, whether or not there is reason to know that the independent contractor's employee is incompetent to operate a vehicle. We believe that employers, under most circumstances, have adequate incentives to investigate and police their own employees, and the duty to do so should generally be left to them.

We reject plaintiffs' contention that Vogler's driver's license policy constituted a self-imposed duty to check the license status of employees of independent contractors with whom it dealt. In support of this argument, counsel for plaintiffs cites this court's opinion in *Snyder v. Curran Township*, 167 Ill. 2d 466 (1995), for the proposition that "when a self-imposed duty is voluntarily undertaken it must be carried out in a non-negligent manner." Since counsel has not supplied us with specific page references to *Snyder*, we assume that counsel refers to pages 474 through 475 of that opinion, wherein we stated:

> "We are also mindful of the long-standing common law principle that, although a governmental agency has discretion in determining whether to perform a public work or make an improvement, once the decision to perform the work is made, it must be done with reasonable care and in a nonnegligent manner." *Snyder*, 167 Ill. 2d at 474-75.

In this case, there was no evidence that Vogler ever undertook a duty to check the license status of employees

who worked for other businesses. Counsel for plaintiffs fails to appreciate the difference between mere formulation of policy and affirmative measures taken to implement that policy. A duty undertaken falls into the latter category, not the former.

Finally, in order for Vogler to be liable under a negligent-entrustment theory, Vogler must have given express or implied permission to Shannon to drive the Sable *at the time the accident occurred.* In *Pelczynski v. J.W. Peters & Sons, Inc.,* 178 Ill. App. 3d 882 (1989), the appellate court held that an entrustor is liable for permitting a poor driver to use the entrustor's vehicle notwithstanding any restrictive directions given to the incompetent driver; however, as the appellate court observed in *Rainey v. Pitera,* 273 Ill. App. 3d 234, 239 (1995), the existence of permission to use the vehicle is an entirely different issue.

In this case, Vogler implicitly gave Margrum, through his employee, Shannon, permission to take the Sable across town to Margrum's shop for detailing and cleaning, and to return it after the work was completed. That was the parties' long-standing custom and practice. Margrum knew the extent of his permission to operate the cars, and he communicated those rules to his employees. Thus, permission to drive the car terminated when the Sable reached Margrum's shop, which was locked up for the night. Entrustment of the car for the evening of March 4, 1996, was to Margrum, not Shannon. To the extent that Shannon may have had individualized permission to drive the Sable, his permission most certainly terminated when the Sable reached Margrum's shop, he relinquished possession of the vehicle, and the shop was closed for the day. The fact that the keys to the car may have been available to any employee with access to the shop does not change the parties' intent as to entrustment or the extent of permission granted to drive

the car. See *Rainey*, 273 Ill. App. 3d at 239 (leaving keys available does not necessarily create a factual question as to implied permission (citing *Taitt v. Robinson*, 266 Ill. App. 3d 130, 134-35 (1994) (Rarick, J., concurring in part & dissenting in part) (concluding that son's express permission to use father's truck on the farm had expired several hours before he took the truck onto the highway without his father's permission and knowledge, and that leaving keys in the ignition did not constitute implied permission to take the truck onto the highway)). The limits of permission to drive the Sable were strictly circumscribed by rules that everyone involved understood. There is no doubt that Shannon's permission to operate the car did not extend into the late evening hours of March 4 and the early morning hours of March 5, when Margrum's business was closed. Shannon had neither Vogler's nor Margrum's permission to use Vogler's vehicle on the night of the collision. In fact, Shannon essentially committed a criminal act—criminal trespass to the vehicle (720 ILCS 5/21—2 (West 1996) (knowingly and without authority operated the vehicle))—when he took the car from Margrum's shop, an act unequivocally beyond the purview of the initial permission granted.

Because we find that Vogler neither knew, nor should have known, that the Sable would likely be used in a manner involving an unreasonable risk of harm to others, we would reverse on that basis alone. We hold that Vogler had no duty to inquire as to Shannon's driver's license status under the circumstances. Moreover, there was no express or implied permission granted to Shannon to use the vehicle at the time the collision occurred; thus, there was no entrustment.

Given our disposition, we find that the circuit court unnecessarily reached plaintiff's constitutional challenge and that it is unnecessary for us to address that issue.

See *Flynn v. Ryan*, 199 Ill. 2d 430, 438 (2002); *Hearne v. Illinois State Board of Education*, 185 Ill. 2d 443, 445 (1999). This court will not address constitutional issues that are unnecessary for the disposition of the case under review even though the court acquires jurisdiction of the case because a constitutional question is involved. *People v. Nash*, 173 Ill. 2d 423, 432 (1996); *People ex rel. Sklodowski v. State of Illinois*, 162 Ill. 2d 117, 131 (1994).

For the foregoing reasons, the judgment of the circuit court is reversed as it pertains to Vogler and we remand this cause for assessment of damages against only Shannon and Margrum.

*Reversed and remanded with directions.*