2019 IL App (1st) 180682

No. 1-18-0682

Opinion filed August 28, 2019

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JENNIFER E. GARLAND, Independent Administrator of the Estate of Scott A. Garland, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) ) | No. 17 L 8307 |
| v. | ) ) | The Honorable |
| SYBARIS CLUBS INTERNATIONAL, INC.; SYBARIS VENTURES ONE, LLC; HK GOLDEN EAGLE, INC.; RANDELL D. REPKE, Independent Executor of the Estate of Kenneth C. Knudson, Deceased; HOWARD D. LEVINSON; and HARK CORPORATION, | ) ) ) ) ) ) ) | Irwin J. Solganick, Judge Presiding. |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     This is the fifth time that this case arising from a fatal airplane crash has come before this court. This appeal involves the trial court's granting of summary judgment in favor of the defendants on the claims that the plaintiff asserted against them under a theory of negligent

entrustment.[1] It also involves the trial court's striking of certain opinions from the affidavits of two of the plaintiff's controlled expert witnesses, which the plaintiff submitted in opposition to the motions for summary judgment. For the following reasons, we affirm the judgment of the trial court.

¶ 2                                    I. BACKGROUND

¶ 3          On January 30, 2006, a Cessna 421B airplane crashed while in the process of landing at Palwaukee Municipal Airport (Palwaukee) in Wheeling, Illinois, killing the four occupants onboard. The pilot-in-command of that airplane for the flight at issue was Mark A. Turek,[2] and the three passengers onboard were Garland, Knudson, and Michael Waugh. Turek and Garland were both employees of Morgan Stanley & Co., Inc. (Morgan Stanley). They were traveling with Waugh, a potential Morgan Stanley client, to Kansas for a business trip. Knudson was one of the owners of the airplane. He was also the owner and founder of the Sybaris defendants. Knudson had a business meeting of his own in Kansas on behalf of Sybaris, and thus he accompanied the other three men on the flight. Another reason that Turek and Knudson were on the subject flight together was that Turek was interested in purchasing a partial share of the ownership of the

---

[1]This court will identify and refer to the parties involved in this appeal in the following manner:

This court will refer to Jennifer E. Garland, independent administrator of the estate of Scott A. Garland, deceased, as "plaintiff." This court will refer to Scott Garland, the deceased, as "Garland."

This court will refer to Defendants Sybaris Clubs International, Inc., and Sybaris Ventures One, LLC, collectively, as "Sybaris."

"Knudson" will be used by this court to refer to the defendant, Randell D. Repke, independent executor of the estate of Kenneth C. Knudson, deceased, and to Kenneth C. Knudson prior to his death. When it is necessary to distinguish between the two, the former shall be referred to as "Estate of Knudson."

Defendant Howard Levinson shall be referred to as "Levinson." Defendant HK Golden Eagle, Inc., shall be referred to as "HK Golden Eagle." Defendant Hark Corporation shall be referred to as "Hark Corporation."

[2]"Pilot in command" is a term of art in aviation, which "means the person who: (1) Has final authority and responsibility for the operation and safety of the flight; (2) Has been designated as pilot in command before or during the flight; and (3) Holds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight." 14 C.F.R. § 1.1 (2006).

Cessna 421B airplane at issue. It had been initially purchased by Sybaris in August 2004. In May 2005, its registration was transferred to defendant HK Golden Eagle, a corporation that had been formed by Knudson and defendant Levinson for the purpose of owning the airplane. The shareholders of HK Golden Eagle were Knudson and defendant Hark Corporation, which itself was a corporation created by Levinson and his wife for purpose of owning their shares in the subject airplane. Knudson and Levinson were interested in making Turek a potential partner in the ownership of the airplane, and thus one reason why Turek piloted the Cessna 421B at issue on the trip to and from Kansas that day with Knudson onboard was to allow Knudson to evaluate Turek as a potential partner in the ownership of the airplane.

¶ 4                                    A. Procedural History

¶ 5        Many claims arose from this incident, and this case has had an extensive procedural history at the trial and appellate level. The first appeal that this court addressed involving this incident was *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653. In that case, this court affirmed the trial court's granting of partial summary judgment in favor of Levinson, Hark Corporation, and other parties not involved in this appeal who had provided flight training to Turek, on the basis that certain allegations against them amounted to claims of educational malpractice, a tort that is not recognized under Illinois law. *Id.* ¶¶ 42-44. The second appeal addressed by this court was *Garland v. Morgan Stanley & Co.*, 2013 IL App (1st) 112121. There, this court held that the exclusive remedy provision of the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2010)) barred the plaintiff's common-law tort claims against Morgan Stanley and Turek's estate, where Garland's death was accidental and Morgan Stanley and Turek were not acting in the "dual capacity" of providing air transport services unrelated to their status as Garland's employer and coemployee. *Garland*, 2013 IL App (1st) 112121, ¶¶ 31, 48-50.

¶ 6        The third appeal, *Garland v. Sybaris Club International, Inc.*, 2014 IL App (1st) 112615 (*Garland I*), involved the causes of action pled by the plaintiff in her ninth amended complaint. These causes of action included those at issue in this appeal, which are the plaintiff's allegations that defendants Levinson and Knudson were negligent in entrusting the Cessna 421B airplane to Turek to pilot, when they knew or should have known that Turek was not qualified to fly that particular type of airplane in the conditions present on the night of the incident. *Id.* ¶¶ 2, 51, 68. The complaint also alleged that Knudson was negligent in failing to supervise Turek during the flight itself. *Id.* ¶ 72. The plaintiff alleged theories of vicarious liability against Hark Corporation, HK Golden Eagle, and Sybaris. *Id.* ¶ 2. The trial court dismissed the causes of action in the ninth amended complaint under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)). *Garland I*, 2014 IL App (1st) 112615, ¶ 2. On appeal, this court affirmed in part and reversed in part. *Id.* ¶ 104. The court affirmed the dismissal of the allegations involving negligent supervision against the Estate of Knudson. *Id.* ¶ 82. However, this court reversed the circuit court's dismissal of the causes of action alleging negligent entrustment by Levinson, Hark Corporation, and the Estate of Knudson and the causes of action alleging vicarious liability for negligent entrustment against HK Golden Eagle and Sybaris. *Id.* ¶¶ 61, 70.

¶ 7        In the fourth appeal, *Garland v. Sybaris Clubs International, Inc.*, 2017 IL App (1st) 160745-U (*Garland II*), this court reversed the trial court's granting of summary judgment in favor of Sybaris on the claims alleging vicarious liability for negligent entrustment. The court held that genuine issues of material fact existed about whether Sybaris was liable under principles of *respondeat superior* for the acts of negligent entrustment by Knudson, which occurred while he was acting within the scope of his employment for Sybaris. *Id.* ¶¶ 39-42.

¶ 8        Following the remand of *Garland II*, all of the defendants moved for summary judgment in

their favor on all claims in the plaintiff's ninth amended complaint alleging negligent entrustment. The defendants' general argument was that no genuine issue of material fact existed about whether Levinson or Knudson had acted negligently in entrusting the subject airplane to Turek for the flight at issue. They further argued that no genuine issue of material fact existed about whether their entrustment was a proximate cause of the crash. After striking certain portions of the affidavits of the plaintiff's controlled expert witnesses, the trial court granted summary judgment in favor of all the defendants.

¶ 9                                    B. Summary Judgment Record

¶ 10        According to evidence in the summary judgment record, the crash at issue occurred at 6:29 p.m. on January 30, 2006. The weather conditions at Palwaukee that day involved a mixture of freezing precipitation and snow that started at 6:49 a.m., turning to light snow and mist that continued intermittently through 4:48 p.m. No major accumulation of ice or snow was reported. The National Weather Service provided a "current icing potential" for 6 p.m. depicting "a probability of icing conditions over the Chicago area which ranged from about 10 percent at 3,000 feet, to about 70 percent at 5,000 feet." Several pilot reports of icing were recorded in the hours surrounding the accident time. As reported at 5:53 p.m. and 6:36 p.m., visibility was unrestricted at 10 statute miles.

¶ 11        Radar data showed the airplane as it approached Palwaukee and entered a left-hand traffic pattern to runway 34. The radar data showed that, as the airplane made a left turn, its calibrated airspeed decreased from 110 knots to 82 knots in the final 30 seconds of data available before the impact occurred. The owner's manual for the Cessna 421B at issue specifies a landing approach speed of 103 knots-indicated airspeed. It also lists stall speeds for the airplane ranging from 94 knots-calibrated airspeed to 83 knots-calibrated airspeed depending on the configuration of the

landing gear, flaps, and bank angle. Vortex generators added to the airplane may have had the effect of lowering some of these airspeed numbers. Radar data also showed that, in the final 30 seconds of data, the pressure altitude of the airplane went from 1400 feet to 1200 feet above mean sea level (MSL). As the runway at Palwaukee was 643 feet above ground level (AGL), this would indicate the altitude of the airplane declined from about 757 feet to 557 feet AGL during this time. Video images showing the airplane on approach were captured from a local security camera. Three frames of video capture the airplane in left wing low, near-vertical descent. The record contains no cockpit or air-traffic control recordings of what was said or occurred inside the cockpit of the airplane on the flight at issue.

¶ 12    As of the date of the crash, Turek was licensed by the Federal Aviation Administration (FAA) to fly airplanes such as the Cessna 421B at issue, as he had a private pilot certificate with single-engine land, multiengine land, and instrument ratings. Turek was the owner of a Baron B55, in which he had substantial flight experience. As calculated by the National Transportation Safety Board (NTSB), Turek's flight logbooks reflected that he had accumulated a total of 1284.05 hours of total flight experience. This included 161.2 hours in single-engine airplanes, 1052.65 hours in multiengine airplanes, and 70.2 hours in flight-simulator devices. He had logged 32.75 hours in Cessna 421 airplanes, of which 18.2 hours were logged prior to his having received the instruction required to act as pilot-in-command of a pressurized airplane. Also, of the 32.75 hours logged in Cessna 421 airplanes, 27.5 hours were obtained prior to Turek's having received dual instruction in a Cessna 421 airplane, and 5.25 hours of logged dual instruction in Cessna 421 airplanes were recorded.

¶ 13    As this court discussed in greater detail in *Waugh*, 2012 IL App (1st) 102653, ¶¶ 4-11, prior to the crash, Turek had undergone training and instruction on the piloting of a Cessna 421B. This

included flight simulator training in 2005 with Arr-ow II, Inc. (Arr-ow), which we summarized in *Waugh* as follows:

"In 2005, Turek successfully completed 33 hours of recurrent twin-engine instrument proficiency training with Eugene Littlefield, his instructor at Arr-ow. According to Littlefield's deposition testimony, Turek was already a qualified and proficient twin-engine pilot at that time. In Littlefield's opinion, Turek was always in control of the airplane, displayed good techniques, procedures, and cockpit management, and was a very proficient pilot. Littlefield opined that Turek was a fully trained, safe, competent, and qualified multi-engine pilot." *Id.* ¶ 10.

However, Littlefield further testified in his deposition that the training that Turek had received at Arr-ow was generic simulation training, not tailored to any particular type of airplane such as a Cessna 421B. The flight simulator on which Turek was trained did not simulate motion, and Turek did not receive any experience pitching up or down, yawing, or dealing with the effects of vortex generators on a multiengine aircraft such as a Cessna 421B. Littlefield testified that Turek did not receive training on flying in icing conditions.

¶ 14        Also, earlier in the month of January 2006, Turek had undergone flight instruction at Recurrent Training Center (Recurrent), which we summarized in *Waugh* as follows:

"From January 6 through January 9, 2006, Turek completed a flight training course with Recurrent to transition from his Baron B55 twin-engine plane to the Cessna 421B. ***

***

*** Recurrent flight instructor Kyle Lyons testified at deposition that Turek, when completing his training coursework at Recurrent, demonstrated through performance and testing that he was fully proficient, competent, and prepared to fly. He

also demonstrated that he was aware of the specifics of a Cessna 421B aircraft. Specifically, Turek completed a Cessna 421B workbook which was reviewed by a Recurrent instructor to verify that Turek was familiar with all information specific to the Cessna 421B. Turek was provided with information on Cessna 421B power settings, speeds, and other procedures for operating in the landing phase of flight. Additionally, Turek's one-on-one training included operations and performance training specific to the Cessna 421B. There was no indication during the Recurrent coursework and evaluation that Turek had any difficulties with regard to descending, turning, speed, or otherwise controlling the aircraft in the airport environment. Turek was taught Cessna 421B stall speeds, proper engine operation, and fuel management." *Id.* ¶¶ 7, 9.

¶ 15    We summarized additional deposition testimony by Lyons in *Garland I*, in the context of addressing the allegations of negligent entrustment at issue in that case:

"Kyle Lyons *** testified at deposition that the training Turek received with him was tailored specifically to a Cessna 421B aircraft. Recurrent provided Turek with a certificate of completion for the flight training. He testified that the pilot students who seek training at Recurrent are experienced pilots. He testified that Turek was an attentive and serious student who showed aptitude and proficiency in the areas covered by the course, including the critical power settings, speed settings and stall speeds for an aircraft in approach and arrival in the landing environment, and instruction regarding the electrical system, power plant, engines, emergency procedures, fuel system and limitations of the Cessna 421B. Reviewing the notes he took during the training, Lyons commented that Turek had needed more full procedure approaches. Lyons testified that Turek demonstrated proficiency in slow flight and stalls. Lyons testified that Turek also

received instruction from other instructors at Recurrent, including instruction regarding approaches, and Turek demonstrated diligence, competency, and proficiency in those maneuvers, with nothing to indicate problems with regard to speed or power settings in an airport environment, problems with speeds or power settings with the gear up or down, or in turns with the gear up or down, and nothing to indicate he was unaware of stall speeds or how to properly manage the engine and fuel. In reviewing notes taken by other flight instructors at Recurrent, Lyons acknowledged that another instructor had noted that Turek entered turns too steeply and that he needed more training on full procedure approaches." *Garland I*, 2014 IL App (1st) 112615, ¶ 28.

Lyons also testified concerning other notations by instructors at Recurrent. One such notation was that Turek's tracking of his approach was "erratic," and another stated that Turek "needs to work on altitude control," as it appeared that "he was still having a little trouble flying the flight training device." Lyons confirmed that in another note he had written that Turek needed help with the horizontal situation indicator, an instrument he was not previously familiar with. Lyons testified that Turek was not given any instruction at Recurrent related to flying in icing conditions, and there was no indication in Turek's paperwork that he had viewed an elective video concerning icing while at Recurrent.

¶ 16        Finally, earlier in the month prior to the crash, Turek had undergone flight instruction and observation with defendant Levinson, who was himself a certified flight instructor. In *Waugh*, we summarized Levinson's testimony on this topic as follows:

> "After completing training at both Arr-ow and Recurrent, Turek flew the subject aircraft for an additional five hours in January 2006 under the observation of Levinson *** . Levinson testified at deposition that the purpose of the observation was for Levinson

to observe Turek fly the subject aircraft and to provide the required hours to satisfy his insurance company requirements. At the time of the observation flight, Levinson was a certified flight instructor with an FAA rating as an airline transport pilot. *** Levinson testified at deposition that Turek was a qualified pilot with many hours of flying experience in a Cessna 421B. The accident aircraft crashed at night while in a landing traffic pattern to land at Palwaukee airport. Much of Turek's in-flight training by Levinson in the accident aircraft was flying in the landing traffic pattern in the same location as the crash site." *Waugh*, 2012 IL App (1st) 102653, ¶ 11.

Levinson further testified in his deposition that he had not provided any night flight training to Turek. He testified that he knew as of the date of the incident that Turek had recently gone through training out of Recurrent and through simulation training at Arr-ow, and Levinson had spoken with Littlefield about Turek's satisfactory completion of the training at Arr-ow.

¶ 17    Levinson testified that on the evening of the incident, before he knew that the crash had occurred, he commented to his wife, "I hope these guys know what they're doing." He explained that he made this comment because it was "kind of a rainy, drizzly night. It wasn't freezing rain at that point, but it could have been at altitude, and I just felt that it was a little bit of a situation that it would take experience to handle." He testified that, about 10 minutes after making this comment, he received a phone call informing him of the plane crash.

¶ 18    Raymond Chou, who was also a pilot and a friend of both Turek and Levinson, testified in a deposition that Levinson had said to him that Turek "liked to fly fast," that he "flew kind of like a sports car driver," and that he rode the brakes too much when flying. In the deposition of Turek's wife, Donna Turek, she described her husband as a "risk taker."

¶ 19    William McGuinn met with Knudson in Kansas on the day of the incident concerning some

real estate there in which Sybaris was interested. McGuinn is also a licensed pilot. We previously summarized McGuinn's deposition testimony concerning his conversations with Knudson that day as follows:

> "During that time, Knudson told McGuinn that he brought Turek on the flight so that Knudson could evaluate Turek's flying and make sure he was competent to fly the aircraft. Knudson described to McGuinn a disagreement Turek and Knudson had on takeoff that day, when Knudson thought Turek was piloting the aircraft to climb too steeply after takeoff, that Turek 'rotated and climbed out steeply without accelerating to a speed that would have allowed them to climb out safely.' Additionally, Knudson told McGuinn that, en route from Chicago to Kansas City, they discovered the landing gear had inadvertently been left down. McGuinn testified that Knudson said he thought Turek's flying skills were not up to par." *Garland I*, 2014 IL App (1st) 112615, ¶ 30.

McGuinn also testified concerning statements he had made to an investigator, in which he stated that Knudson had said to him "that he would have to keep a real close eye on Mr. Turek" and would "have to watch this guy real close." Asked if he remembered Knudson saying this, McGuinn answered:

> "They were my relation of the gist of what Mr. Knudson said. It was the airplane was Mr. Knudson's baby, he had wash [*sic*] that airplane, maintained it, flew it, he knew every nook and cranny of the airplane, he was very proud of it and he was interested in making sure that someone had the same care for it that he did, and that's why he—why he mentioned that he was going to keep a real close eye on it. He was interested in this guy treating the plane as he did."

¶ 20    Wendy Lavezzi, M.D., was an assistant medical examiner with the office of the Cook

County Medical Examiner who was involved in the autopsies of the four men killed in the subject airplane crash. Dr. Lavezzi testified in an evidence deposition that, based on seat-belt positioning, Turek was sitting in the left front seat, which would be the pilot's seat of the Cessna 421B. Dr. Lavezzi further testified that, based on her autopsy of Turek, she did not see any natural disease indicating that he had ever had a heart attack.

¶ 21      John Brannen, the investigator for the NTSB in its investigation of this crash, testified that in the process of investigating whether any mechanical problems existed with the airplane that may have led to the crash, no evidence was found indicating any problems with the airplane's engines that would have prevented them from running. The engines were applying power to the propellers, and the propellers were rotating at the time of impact. Also, Brannen did not find any evidence of fuel starvation during the wreckage examination. Brannen further testified in his deposition that, in normal flight, one of the responsibilities of the pilot-in-command is to make sure that an airplane does not drop below the manufacturer's recommended stall speeds. He also testified that, while travel patterns and altitudes can vary by airport, in general travel patterns for an airplane approaching and on the downwind leg are usually about 800 to 1000 feet above the elevation of an airport.

¶ 22      The summary judgment record includes two affidavits by the plaintiff's controlled expert witnesses, Marc Fruchter and William Lawrence. The opinions set forth in these affidavits of Fruchter and Lawrence were largely the same as those submitted by the plaintiff in response to the motions to dismiss under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)) that this court addressed in *Garland I*, 2014 IL App (1st) 112615, ¶¶ 25-27. In the motions to dismiss that were at issue in *Garland I*, the defendants did not move to strike any portion of the affidavits of Fruchter and Lawrence. However, with respect to the motions for

summary judgment at issue in this appeal, the defendants filed motions to strike both affidavits. The trial court conducted a hearing on these motions to strike prior to conducting a hearing on the motion for summary judgment, and it struck portions of the opinions of both Fruchter and Lawrence. Thus, certain portions of the affidavits of these two expert witnesses were not considered by the trial court in ruling on the motions for summary judgment.

¶ 23        Fruchter's affidavit states that he is the founder and president of Aviation Consultants, Ltd. He has over 38 years of experience in various aspects of the aviation industry. He has flown in excess of 13,000 hours, with at least 11,500 of those as pilot-in-command. He holds multiple FAA licenses, ratings, and certifications for piloting, instructing, testing, and certification. He has experience piloting both the Cessna 421B model of airplane that is at issue in this case, as well as the Baron B55 aircraft that Turek owned and normally flew.

¶ 24        Fruchter's affidavit includes 14 paragraphs under the heading of "Opinions," which were the subject of the defendants' motions to strike. These opinions were preceded by his discussion of those facts upon which his opinions were based. Those factual bases that are pertinent to our analysis are set forth in the discussion below. However, we set forth the full text of Fruchter's opinions below, with the text in italic type showing those portions of Fruchter's affidavit that the trial court struck from consideration on summary judgment and which the plaintiff appeals:

> "1. The accident took place during the period identified in the [federal aviation regulations (14 C.F.R. § 1.1 *et seq.* (2006)) (FARs)] as night [citation] and Mr. Turek did not meet the requirement [citation] to serve as [pilot-in-command (PIC)] on the accident flight. Therefore Mr. Turek was negligent in showing himself as PIC on the instrument flight plan for the accident flight.
>
> 2. There is no evidence that Mr. Turek had satisfied the requirement [citation] for a

biennial flight review and was, therefore, not qualified to serve as PIC on the accident flight. Therefore it was negligent for Mr. Turek to file a flight plan showing himself as PIC for the accident flight or to serve as PIC on that flight.

3. The vast majority of Mr. Turek's multi-engine flight experience was obtained in the B-55 Baron aircraft that he owned. [Citation.] The Baron differs significantly from the Cessna 421B in numerous ways including, but not limited to: pressurization, geared engines, 44% more powerful engines, 49% greater maximum gross takeoff weight, and higher stall speeds for the Cessna. ***

4. Mr. Turek had logged no flight experience in a Cessna 421B that included night and/or icing conditions—both of which were forecast *** on the accident flight. For this reason alone Mr. Turek should have declined to serve as PIC on the accident flight. *Failing to insure that a competent and experienced pilot was controlling the aircraft created a very unsafe condition.*

5. From the radar data noted above, witness statements, and video of the accident it is apparent that Mr. Turek *allowed* the airspeed of N920MC [*i.e.*, the FAA registration number of the Cessna 421B at issue] to decrease until the aircraft stalled causing a loss of control and impact with the ground.

6. *During his training at Recurrent Training Center (RTC) Mr. Turek exhibited a tendency to enter turns too steeply* [citation]*, which would lead to an increased stall speed for the aircraft. This can cause a dangerous condition—especially if the aircraft is flying below the recommended speed for a segment of flight. This condition existed on the accident flight and most likely was the cause of the accident.*

7. *Mr. Knudson, as an owner of the aircraft, had a duty to insure that Mr. Turek was*

*qualified, current, and proficient to perform the flight before allowing him to fly N920MC on the accident flight. Since Mr. Knudson was aware, or should have been aware, that the flight would operate during the hours of night he should not have allowed a pilot who had no experience in a Cessna 421B at night and was not night current to fly the accident flight. By allowing this, he was negligent and created a very dangerous condition for the accident flight.*

* * *

10. *From the above it is evident that neither Mr. Turek nor Mr. Knudson was qualified to act as PIC on the accident flight.*

11. Mr. Howard Levinson was aware that Mr. Turek was to pilot N920MC on the accident flight [citation]. As both Mr. Turek's flight instructor and an owner of N920MC, Mr. Levinson had a duty to insure that Mr. Turek was qualified, current, and competent to fly the aircraft on the accident flight. If Mr. Levinson was aware that Mr. Turek was not qualified to serve as PIC on the accident flight he had a duty to insure that Mr. Knudson was qualified to serve as PIC. By failing to do so he failed in his duty to insure a safe flight.

12. *Mr. Howard Levinson had serious difficulty during a Cessna 421B training session at RTC in September 2007.* [Citation.] *His inability to fly a standard approach as part of this training brings into question the value of the five (5) hours he served as Mr. Turek's flight instructor to allow Mr. Turek to qualify under the insurance policy for N920MC.*

13. HK Golden Eagle, as the registered owner of N920MC, through its principals Mr. Howard Levinson *and Mr. Kenneth Knudson*, had a duty to insure that a qualified,

current, and competent pilot was flying N920MC on the accident flight.

14. *For all of the above reasons, Messrs. Turek, Knudson, and Levinson were negligent by engaging in the above-noted conduct or failing to engage in the above-noted conduct. The negligent acts and omissions by Mark Turek, Kenneth Knudson, and Howard Levinson were all contributing causes to the accident involving N920MC and the death of the four persons onboard, including Scott Garland.*"

¶ 25    Lawrence's affidavit states that he had been a pilot for over 45 years and had accumulated about 4500 hours in over 100 different types, models, and series of helicopters and fixed-wing aircraft. He was a graduate of the United States Naval Test Pilot School and was an engineering and experimental test pilot from 1978 to 1991. He flew for the United States Marine Corps for 26 years, and since his retirement in 1991 he had been flying as part of his second career as an aviation consultant.

¶ 26    Lawrence's affidavit includes 13 paragraphs under the heading of "Opinions," which were also the subject of the defendants' motions to strike. As with Fruchter's affidavit, Lawrence's opinions were preceded by his discussion of the facts upon which his opinions were based. Those factual bases that are pertinent to our analysis are set forth in the discussion below. However, we again set forth the full text of Lawrence's opinions, with the text in italic type showing those portions of his affidavit that the trial court struck from consideration on summary judgment:

"1. No material or information has been presented that the material or mechanical condition of N920MC contributed to this crash. *The NTSB docket discusses the various mechanical inspections and observations made during the investigation. The findings included engine and propeller examinations that found no anomalies.*

2. On January 30, 2006, Mr. Turek was not *legally qualified* to function as the pilot

in command of N920MC. To function as the pilot in command, Mr. Turek would have to have logged 3 night landings in the previous 90 days. He logged one. Further, his biennial flight review had expired some six months earlier.

3. On January 30, 2006, Mr. Knudson was not *legally qualified* to function as the pilot in command of N920MC. To function as the pilot in command, Mr. Knudson would have [had] to have flown 6 instrument approaches in the previous 6 months, flown 3 takeoffs and landings in the previous 90 days and logged 3 night landings in the previous 90 days. None of these activities were accomplished.

4. *Mr. Knudson was negligent in that he allowed Mr. Turek to occupy the left seat*[3] *of N920MC and to function as the pilot in command. As the owner of N920MC, Mr. Knudson was responsible to ensure a qualified aircrew was flying the airplane. Either he knew Mr. Turek was not qualified, or he did not check Mr. Turek's qualifications. Either way, he was negligent. Further, he should have known that Mr. Turek was not aeronautically adapted to fly N920MC at night, having never flown a Cessna 421 at night. Even further, he should have factored in the deteriorating weather.*

5. *Mr. Turek was not aeronautically adapted to fly as the pilot in command of N920MC. Mr. Turek was neither qualified to fly at night nor was he adapted to fly at night in a Cessna 421.* He had logged only one night landing in the previous 90 days and had never flown a Cessna 421 at night.

6. Mr. Turek was negligent in that he agreed to fly N920MC as the pilot in command in that he knew he did not have the necessary experience to ensure a safe flight. Pilots are individually responsible for maintaining their currency and Mr. Turek

---

[3]In a preceding section of his affidavit, Lawrence stated that the left seat of most airplanes is considered to be the command seat, and this was the situation in the Cessna 421B at issue.

certainly knew his qualifications better than anyone else. By agreeing to function as the pilot in command, he ignored both his inexperience in the Cessna 421 in general and his lack of recent night time as well. He also should have realized that his BFR [(biennial flight review)] had expired.

7. *During the approach to Palwaukee airport at about 1829 CST, Mr. Turek's workload increased to the point that he reverted to the habit patterns formed in his Beech B55 Baron, N281R. Even in familiar aircraft, the workload increases when conditions such as nighttime and adverse weather conditions are present. Add unfamiliarity with a relatively new aircraft type and the pilot becomes easily overwhelmed. In such cases, the pilot will revert to old habit patterns.*

8. *Mr. Turek flew a VFR [(visual flight rules)] downwind entry to runway 34 and arrived at an abeam position too close to the runway and too slow. The wind was right-gear quartering, blowing N920MC towards the runway and increasing the ground speed. Even if Mr. Turek had panned an appropriate distance from the runway for his abeam position, the wind would have served as a mechanism to place the airplane closer to the runway than desired. Since night vision is limited, especially in poor weather conditions, it would have been very difficult for Mr. Turek to perceive the improper alignment.*

9. *Mr. Turek either tightened his turn to the point that he entered an approach turn stall, or increased the angle of attack and bank angle to the point that he stalled the aircraft. In either event, Mr. Turek stalled N920MC as he turned for final. More likely than not, Mr. Turek did not recognize the imminent danger posed by his poor approach to landing. Also, he did not want to ask for assistance from the man he was seeking to impress, so he continued the approach, and whether he simply slowed below stall speed,*

- 18 -

*or pulled the airplane into an approach turn stall, the results were the same.*

10. *Mr. Knudson was negligent in that he failed to take control of the N920MC when he should have recognized the approach was not being flown as necessary for a successful landing. The only pilot in N920MC with appropriate experience to recognize the danger of the approach that was being flown was Mr. Knudson, the owner of the airplane. Although conversation that occurred in the cockpit will never be known, it is obvious that Mr. Knudson either never took control of the aircraft or did not take control in time to prevent the stall and ensuing crash. Mr. Knudson's experience in the Cessna 421, and his ownership of N920MC, positioned him in a place of responsibility that he did not assume.*

11. At the altitude N920MC entered the stall, there was not sufficient time nor altitude to recover from the stall. N920MC stalled well below 1,000 feet AGL, more probably at about 650 feet AGL. (The NTSB docket radar information shows N920MC at about 1200 feet MSL below 85 KIAS; runway 16/34 elevation is 643 feet AGL.)

12. Mr. Levinson was likewise negligent in that he should have known that neither Knudson nor Turek were qualified to function as pilot in command of N920MC. Levinson, as co-owner of N920MC, had an equal responsibility to Knudson to ensure the airplane was properly crewed. Levinson was a Certified Flight Instructor, and as such, clearly understood currency requirements. Having flown with Turek as a 421 checkpilot, he should have known that Turek was not current at night and had never flown a Cessna 421 at night. He also should have checked Turek's logbook for BFR currency. And, with regard to Knudson, he had flown with him many times. He was very knowledgeable concerning the time N920MC had spent in maintenance and should have been well aware

that virtually all of Knudson's currency requirements had expired.

13. *N920MC crashed because of the combined negligence of [Messrs.] Knudson, Turek, and Levinson. The combination of the negligent acts of Knudson, Turek, and Levinson, as discussed in the paragraphs above, was responsible for, and was the cause of the crash of N920MC.*"

¶ 27                           C. Trial Court's Ruling

¶ 28      On the record as set forth above, the trial court granted summary judgment in favor of all defendants on the claims of negligent entrustment. In doing so, the trial court reasoned that a factual dispute may exist on the issue of whether the defendants had been negligent in entrusting the subject airplane to Turek for the flight at issue. Nevertheless, the trial court concluded that the plaintiff had failed to present evidence necessary to demonstrate the existence of a genuine issue of material fact about whether their negligent entrustment of the airplane to Turek was a proximate cause of the crash. The trial court reasoned that the evidence did not show what Turek had done, if anything, to cause the crash of the airplane that and the plaintiff's experts' opinions about what Turek had done to cause the crash were based on speculation. The trial court further reasoned that the plaintiff's experts had not shown a causal nexus between the reasons that they contended should have prevented the defendants' entrustment to Turek and the crash itself. The plaintiff filed a timely notice of appeal.

¶ 29                              II. ANALYSIS

¶ 30      All causes of action at issue in this appeal involve negligent entrustment. In summary, the plaintiff alleges in her ninth amended complaint that defendants Levinson and Knudson were negligent in entrusting the subject Cessna 421B airplane to Turek to pilot, when they knew or should have known that Turek was incompetent or inexperienced to fly that particular type of

airplane in the conditions he was likely to encounter on the night of the crash. She alleges that defendants Hark Corporation, Sybaris, and HK Golden Eagle are vicariously liable for the acts of negligent entrustment by Levinson, Knudson, or both.

¶ 31    To prove negligent entrustment, a plaintiff must establish that " 'the defendant gave another express or implied permission to use or possess a dangerous article or instrumentality that the defendant knew, or should have known, would likely be used in a manner involving an unreasonable risk of harm.' " *Garland I*, 2014 IL App (1st) 112615, ¶ 53 (quoting *Northcutt v. Chapman*, 353 Ill. App. 3d 970, 974 (2004)). Although an airplane is not an inherently dangerous article, it may become so if operated by a pilot who is incompetent, inexperienced, or reckless. *Id.* ¶ 56.

¶ 32    In a claim for negligent entrustment, the liability of the defendant entrustor is not based on principles of vicarious liability for the actions of an entrustee with respect to the article at issue. See *Seward v. Griffin*, 116 Ill. App. 3d 749, 754 (1983). Rather, the defendant entrustor's liability arises from his or her own independent act of negligence in the entrustment of the article at issue. *Id.* The supreme court has set forth, in a case involving the entrustment of an automobile, the "two primary considerations in negligent-entrustment analysis: (1) whether the owner of the vehicle entrusted the car to an incompetent or unfit driver, and (2) whether the incompetency was a proximate cause of a plaintiff's injury." *Evans v. Shannon*, 201 Ill. 2d 424, 434 (2002) (citing *Taitt v. Robinson*, 266 Ill. App. 3d 130, 132 (1994)).

¶ 33    Though courts have phrased the proximate causation requirement in different ways, it has long been the law that the plaintiff must establish that the incompetency, inexperience, or recklessness on the part of the entrustee, about which the plaintiff alleges that the defendant knew or should have known so as to prevent the entrustment, is a proximate cause of the injury

at issue. *Bensman v. Reed*, 299 Ill. App. 531, 534 (1939) ("The liability of the owner does not arise by merely proving that he gave permission to an incompetent driver to drive his automobile but it must also appear that the incompetency alleged was the proximate cause of the commission of the negligent act which caused the injury."); *Giers v. Anten*, 68 Ill. App. 3d 535, 540-41 (1978) (same); *King v. Petefish*, 185 Ill. App. 3d 630, 634 (1989) (same); *Jones v. Beker*, 260 Ill. App. 3d 481, 487 (1994) ("owner must knowingly entrust his automobile to an incompetent or unfit driver and that incompetency or unfitness must be a proximate cause of the accident that injured the third party"); *McGath v. Price*, 342 Ill. App. 3d 19, 28 (2003) (liability is established "if (1) the lender knows or should know that the one to whom he loaned it is incompetent, inexperienced or reckless in its use, and (2) it was this incompetence, inexperience or recklessness that was a proximate cause of the resulting accident"); *Lulay v. Parvin*, 359 Ill. App. 3d 653, 658 (2005) (same). Where a plaintiff fails to establish a causal nexus between the incompetence, inexperience, or recklessness that the plaintiff alleges should have prevented the entrustment and the entrustee's act or omission that produced the injury, the element of proximate causation is not satisfied. See *Bensman*, 299 Ill. App. at 536 (judgment *n.o.v.* for defendant affirmed where no evidence showed that entrustee's defective vision, which was the incompetency that plaintiff alleged should have prevented defendant's entrustment of an automobile to him, caused the defendant's act of negligent driving that injured the plaintiff).

¶ 34                          A. Striking Expert Witness Opinions

¶ 35       Before addressing the merits of summary judgment, we first address the threshold issue raised by the plaintiff of whether the trial court erred in striking certain opinions in the affidavits of the plaintiff's two controlled expert witnesses, Fruchter and Lawrence. The opinions that were stricken were not considered by the trial court in deciding the motions for summary judgment.

The plaintiff argues on appeal that the trial court erred in striking these opinions and that they should have been considered by the trial court in determining the propriety of summary judgment.[4]

¶ 36    As a preliminary matter, we summarily reject the plaintiff's argument that the law-of-the-case doctrine should have prevented the defendants from moving to strike the opinions of Fruchter and Lawrence in the first instance. The plaintiff argues that, as four appeals have been decided in this case, the fact that the defendants had never previously objected to the use or admissibility of the opinions of the plaintiff's expert witnesses should be viewed as a waiver by the defendants of the objections raised in their motions to strike. In *Garland II*, 2017 IL App (1st) 160745-U, ¶¶ 15-26, this court engaged in a lengthy discussion of the law-of-the-case doctrine in rejecting an almost-identical argument made by the plaintiff in that appeal. The doctrine provides that, where an issue has been litigated and decided, a reviewing court's unreversed decision on that question of law or fact settles that question for all subsequent stages of the suit. *Id.* ¶ 16. "[I]n order for that doctrine to apply to an issue, the specific issue must have previously been decided." *Id.* ¶ 26. Here, prior to the defendants' filing of the motions to strike presently at issue, neither the trial court nor this court decided the issue of whether all or part of the affidavits of Fruchter and Lawrence should be stricken. Because these matters were not decided, the law-of-the-case doctrine has no application here.

¶ 37    The sufficiency of affidavits filed in opposition to a motion for summary judgment is governed by Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013). *Woolums v. Huss*, 323 Ill.

---

[4]While the plaintiff's brief argues generally that there was no basis for the trial court to strike any of the opinions of Fruchter or Lawrence and that all of their opinions were proper, we address only those stricken opinions about which the plaintiff makes a specific argument in her brief. To the extent the plaintiff intended to argue that the trial court erred in striking any opinions of her experts not specifically discussed, the failure to articulate a specific argument constitutes a forfeiture of the argument. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

App. 3d 628, 635 (2001). In pertinent part, that rule requires that affidavits must (1) be made on the personal knowledge of the affiant, (2) set forth with particularity the facts on which the claim is based, (3) attach sworn or certified copies of documents that the affiant relied on, and (4) consist of facts admissible in evidence, not conclusions. Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013). These requirements are based on a recognition that, in the context of summary judgment, an affidavit serves as a substitute for the testimony of a witness at trial. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335-36 (2002). In addressing a motion for summary judgment, a trial court may not consider evidence or testimony that would not be admissible at trial. *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 21. Therefore, affidavits submitted in opposition to a motion for summary judgment must consist of facts admissible in evidence and not of conclusions. *Id.*

¶ 38　　　　While expert witnesses may testify and base opinions on facts assumed to be true, those facts must have support in the evidence. *Woolums*, 323 Ill. App. 3d at 635-36. While an expert witness at trial may give opinion testimony without disclosing the facts underlying his opinion (see *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981)), the same is not true of affidavits in summary judgment proceedings. *Robidoux*, 201 Ill. 2d at 333-34. This is due to the fact that at trial an expert may be cross-examined, but cross-examination is unavailable as a means to test an expert's testimony submitted by affidavit on summary judgment. *Id.* Thus, the standard for admission of an expert's affidavit in the context of summary judgment is higher than for the admission of an expert's opinion at trial. *Id.* at 338. In the summary judgment context, a trial court may strike all or part of the affidavit of an expert witness where the conclusions of the expert expressed in the affidavit lack factual support in the evidence and are instead based on speculation or conjecture as to what might have happened. See *Berke*, 2016 IL App (1st) 150397, ¶¶ 21-25; *Perona v. Volkswagen of America, Inc.*, 2014 IL App (1st) 130748, ¶¶ 49-53. The

propriety of a trial court's striking of all or part of an affidavit in the context of summary judgment is subject to *de novo* review on appeal. *Berke*, 2016 IL App (1st) 150397, ¶ 21.

¶ 39                                    1. Affidavit of Fruchter

¶ 40                                    a. *Fruchter's Opinion 4*

¶ 41      The plaintiff first argues that the trial court erred in striking the italicized portion of Fruchter's opinion 4, which states as follows:

> "4. Mr. Turek had logged no flight experience in a Cessna 421B that included night and/or icing conditions—both of which were forecast *** on the accident flight. For this reason alone Mr. Turek should have declined to serve as PIC on the accident flight. *Failing to insure that a competent and experienced pilot was controlling the aircraft created a very unsafe condition*."

¶ 42      The trial court struck the italicized sentence on the basis that it was argumentative. The plaintiff argues that, in other opinions not stricken by the trial court, Fruchter explained why Turek was not competent and qualified to fly the Cessna 421B, regardless of his experience flying other airplanes. Although this is not a negligence claim against Turek, we will consider this opinion in our *de novo* review of summary judgment and give it the weight that it deserves.

¶ 43                                    b. *Fruchter's Opinion 5*

¶ 44      The trial court struck the word "allowed" from Fruchter's opinion 5, reasoning that the word "allowed," as italicized in the following sentence, constituted a conclusory statement:

> "5. From the radar data noted above, witness statements, and video of the accident it is apparent that Mr. Turek *allowed* the airspeed of N920MC to decrease until the aircraft stalled causing a loss of control and impact with the ground."

¶ 45      The plaintiff contends that this was a proper opinion, as Fruchter adequately explained that

the factual basis for it was radar data, witness statements, and video of the accident. We agree that the trial court properly struck this opinion as a statement of what Turek "allowed" to happen to the airplane. Although the radar data, witness statements, and video provide a factual basis for Fruchter to express what happened to the airplane itself, the conclusion that Turek "allowed" this to happen to the airplane is mere speculation or conjecture as to what may have happened inside the cockpit of the airplane. As such, we agree that there is insufficient factual basis in the evidence to support this opinion as to what Turek "allowed."

¶ 46                                 c. *Fruchter's Opinion 6*

¶ 47        The trial court struck Fruchter's opinion 6 in its entirety, which stated:

> "6. During his training at Recurrent Training Center (RTC) Mr. Turek exhibited a tendency to enter turns too steeply [citation], which would lead to an increased stall speed for the aircraft. This can cause a dangerous condition—especially if the aircraft is flying below the recommended speed for a segment of flight. This condition existed on the accident flight and most likely was the cause of the accident."

¶ 48        The trial court struck this opinion because it found that the word "tendency" was conclusory and without factual support. The plaintiff points out that Fruchter's affidavit cites as factual support page 105 of the deposition of Lyons, Turek's instructor at Recurrent. We have reviewed the deposition testimony of Lyons as cited to us by the plaintiff. The full extent of this testimony appears to be Lyons confirming that another instructor at Recurrent had made a notation during a training session with Turek on January 7, 2006, which stated, "entry in turns were too steep." There is no further discussion of this notation. We thus agree with the trial court that the evidence provides insufficient factual support for opinion 6 as expressed by Fruchter, and it was properly stricken.

¶ 49                                    d. *Fruchter's Opinion 7*

¶ 50        The trial court struck Fruchter's opinion 7 in its entirety, which stated:

> "7. Mr. Knudson, as an owner of the aircraft, had a duty to insure that Mr. Turek
> was qualified, current, and proficient to perform the flight before allowing him to fly
> N920MC on the accident flight. Since Mr. Knudson was aware, or should have been
> aware, that the flight would operate during the hours of night he should not have allowed
> a pilot who had no experience in a Cessna 421B at night and was not night current to fly
> the accident flight. By allowing this, he was negligent and created a very dangerous
> condition for the accident flight."

¶ 51        The trial court struck this opinion on the basis that any statement concerning Knudson's knowledge was speculative. The plaintiff argues that this opinion does not call for speculation concerning Knudson's knowledge. Rather, according to the plaintiff, Fruchter is stating that, before entrusting the plane to Turek, Knudson had to know whether Turek was qualified and current to safely operate the airplane, including at night. The plaintiff argues that, regardless of Knudson's actual knowledge, it is evident that he was negligent because either (1) he knew Turek was unqualified and lacked currency but entrusted the airplane to him anyway or (2) he did not ascertain knowledge of Turek's credentials and thus failed in his responsibility to obtain this information before entrusting the airplane to Turek.

¶ 52        We agree that this opinion was properly stricken. Initially, neither Fruchter's affidavit nor the plaintiff's brief cites any federal aviation regulation or similar law that imposes specific responsibilities on the owner of an airplane such as the subject Cessna to ensure that the pilot-in-command of that airplane meets certain qualifications or proficiencies. *Cf.* 14 C.F.R. § 91.3 (2006) (responsibility and authority of pilot-in-command). As such, we interpret the first

sentence of this opinion as a general expression of the duty that an owner of a potentially dangerous article has to deny permission to another to use that article when the owner knows or should know that it is likely to be used in a manner involving an unreasonable risk of harm. See *Garland I*, 2014 IL App (1st) 112615, ¶ 53. Given this, we disagree with the plaintiff's argument that Fruchter can express the opinion that Knudson breached this duty without factual support in the evidence of what Knudson actually knew or should have known about Turek's incompetence, inexperience, or lack of qualifications to fly a Cessna 421B at night. As no such factual support exists in the evidence, Fruchter's opinion 7 is conclusory and was properly stricken.

¶ 53                              e. *Fruchter's Opinion 10*

¶ 54    The trial court struck Fruchter's opinion 10 in its entirety, which stated:

> "10. From the above it is evident that neither Mr. Turek nor Mr. Knudson was qualified to act as PIC on the accident flight."

¶ 55    The trial court did not articulate a specific reason for striking this opinion. The plaintiff argues that striking it was inconsistent with the trial court's rulings on other opinions by Fruchter that the trial court had allowed to stand. Specifically, the plaintiff argues that portions of Fruchter's opinions 1 through 4, which the trial court had allowed to stand, support opinion 10. It appears that opinion 10, as it pertains to Turek, is no different than the opinions that the trial court allowed Fruchter to express in his opinions 1 and 2, which were not stricken. Thus, the plaintiff suffered no prejudice from the striking of opinion 10 as it pertains to Turek. The plaintiff makes no argument that the trial court erred in striking opinion 10 as it pertains to Knudson, as the plaintiff is not appealing the striking of Fruchter's opinion 9, which is the only preceding opinion by him pertaining to Knudson's qualifications to serve as pilot-in-command.

¶ 56                              f. *Fruchter's Opinion 12*

¶ 57    The trial court struck Fruchter's opinion 12 in its entirety, which stated:

"12. Mr. Howard Levinson had serious difficulty during a Cessna 421B training session at RTC in September 2007. [Citation.] His inability to fly a standard approach as part of this training brings into question the value of the five (5) hours he served as Mr. Turek's flight instructor to allow Mr. Turek to qualify under the insurance policy for N920MC."

¶ 58    The trial court's basis for striking this opinion was that it was conclusory and speculative. The plaintiff argues that it is factually supported by the deposition testimony of Lyons that Levinson had serious difficulty during his own training session in a Cessna 421B in September 2007. The plaintiff argues that the essence of this opinion was that if Levinson himself was having serious difficulty operating the same kind of airplane during his own training, a year and eight months after he gave instruction to Turek, this calls into question the value of the five hours during which he served as Turek's instructor in the weeks prior to the incident. We agree that this opinion by Fruchter is too speculative and conclusory on the issue of negligent entrustment by Levinson of the subject airplane to Turek for the flight at issue. We have previously affirmed the dismissal of the plaintiff's claims that Levinson provided negligent flight instruction to Turek. *Waugh*, 2012 IL App (1st) 102653, ¶¶ 43-44. Thus, opinion 12 was properly stricken.

¶ 59                                  g. *Fruchter's Opinion 14*

¶ 60    The trial court struck Fruchter's opinion 14 in its entirety, which stated:

"14. For all of the above reasons, Messrs. Turek, Knudson, and Levinson were negligent by engaging in the above-noted conduct or failing to engage in the above-noted conduct. The negligent acts and omissions by Mark Turek, Kenneth Knudson, and Howard Levinson were all contributing causes to the accident involving N920MC and the

death of the four persons onboard, including Scott Garland."

¶ 61    The trial court's basis for striking this opinion was that the factual basis was insufficient for Fruchter to express an opinion on causation. The plaintiff argues that this ruling is inconsistent with the trial court's rulings on other opinions by Fruchter that the trial court allowed to stand, specifically his opinions 1 and 2 stating that Turek was not qualified to serve as pilot-in-command on this flight. The plaintiff argues that this is a sufficient reason why Levinson and Knudson should not have entrusted their airplane to Turek and, had they not done so, Turek would never have been piloting the airplane and the crash would not have occurred. The plaintiff additionally points out that the trial court allowed most of Fruchter's opinion 5 to stand, except for the word "allowed." The plaintiff argues that, given the facts set forth in opinion 5 that the airplane's speed decreased until it stalled on approach for landing, as well as the fact that it is undisputed that Turek was the pilot on the flight at issue, a sufficient factual basis exists for Fruchter to express the opinion that the defendants' entrusting of their aircraft to Turek, despite his lack of experience, was a contributing cause of the crash in which Garland was killed.

¶ 62    Initially, we find that the first sentence of opinion 14 is essentially a restatement of the preceding opinions by Fruchter concerning the negligence of Turek and the defendants. Some of these preceding opinions on negligence were allowed to stand, and others were stricken. As such, this first sentence of opinion 14 is essentially cumulative of opinions Fruchter previously expressed, and the plaintiff suffered no prejudice on summary judgment by its being stricken.

¶ 63    As for the second sentence of opinion 14, which concerns causation, we find that this opinion was properly stricken. After carefully reviewing the facts set forth in Fruchter's affidavit upon which he purports to rely in expressing his opinion that the negligent acts and omissions of Turek, Knudson, and Levinson were all causes of the crash at issue, we conclude that the

summary judgment record lacks factual support for this opinion. We reiterate that the claims at issue involve negligent entrustment by Knudson and Levinson. As we discussed above (*supra* ¶ 33), establishing the element of causation in a negligent entrustment claim requires proof that the incompetency, inexperience, or recklessness on the part of Turek, about which the plaintiff alleges that Levinson and Knudson knew or should have known so as to prevent the entrustment of their airplane to him, is a proximate cause of the crash in which Garland was killed.

¶ 64    For purposes of summary judgment, Fruchter's affidavit does cite evidence of incompetency or inexperience on the part of Turek. Specifically, Fruchter relies on evidence in Turek's flight logbooks to support the proposition that Turek did not have sufficient takeoff and landing experience at night or a current biennial flight review, such as to be qualified under federal aviation regulations to serve as pilot-in-command of the Cessna on the subject flight. Further, Turek lacked experience flying a Cessna 421B at night. Fruchter's affidavit also cites factually supported evidence from the radar data, witness statements, and video to support the opinion of what happened to the airplane itself. In other words, there is evidence that the plane's airspeed decreased until the airplane stalled and the stall caused a loss of control and impact with the ground.

¶ 65    What is absent from Fruchter's affidavit is a reference to any fact in the evidence upon which he relies to support the existence of a causal nexus between the specific incompetence or inexperience he identifies on the part of Turek and the decrease in airspeed, stall, and crash experienced by the subject airplane. Fruchter does not cite any fact of what Turek specifically did or failed to do as a result of his inexperience or incompetence that caused the airplane's decrease in airspeed, stall, and crash. It is not sufficient to state simply that these things occurred while Turek was the airplane's pilot, because this does not show that they were caused by his

incompetence or inexperience. They may have been caused by an isolated error that had nothing to do with his competence or experience. For this same reason, we reject the plaintiff's argument that causation can be shown simply based on the fact that, had the defendants not permitted Turek to fly as pilot-in-command, he would not have been flying the Cessna at such a slow speed that he caused it to stall and crash. Without evidence of what Turek specifically did or failed to do as a result of his inexperience or incompetence that caused the airplane to stall and crash, there is not a sufficient factual basis for Fruchter to express an opinion that the defendants' negligent entrustment of the airplane to Turek was a contributing cause of the crash. Thus, the second sentence of Fruchter's opinion 14 was based on speculation and conjecture as to what might have happened to cause the crash, and it was properly stricken by the trial court.

¶ 66                              2. Affidavit of Lawrence

¶ 67                              a. *Lawrence's Opinion 1*

¶ 68        The trial court struck the italicized portion of the following opinion by Lawrence:

> "1. No material or information has been presented that the material or mechanical condition of N920MC contributed to this crash. *The NTSB docket discusses the various mechanical inspections and observations made during the investigation. The findings included engine and propeller examinations that found no anomalies.*"

¶ 69        The trial court's basis for striking part of this opinion was that NTSB findings cannot be evidence in the case. The plaintiff argues that NTSB factual findings are admissible and therefore the trial court should not have stricken part the opinion on this basis. While reports containing the NTSB's determinations including the probable cause of an accident are statutorily prohibited from being "admitted into evidence *or used* in a civil action for damages resulting from a matter mentioned in the report" (emphasis added) (49 U.S.C. § 1154(b) (2006)), factual

accident reports containing the results of an NTSB investigator's investigation of the accident are not subject to this bar. 49 C.F.R. § 835.2 (2006); see *Brokaw v. Boeing Co.*, 137 F. Supp. 3d 1082, 1093 (N.D. Ill. 2015). As it appears the information referenced in Lawrence's opinion 1 is part of the NTSB investigator's factual findings of the accident, it is not subject to any bar on its "use" in civil ligation. Thus, it is information on which Lawrence can rely as a basis for his opinion under Illinois Rule of Evidence 703 (eff. Jan. 1, 2011), and we will consider it in our *de novo* review of summary judgment.

¶ 70                              b. *Lawrence's Opinion 4*

¶ 71       The trial court struck Lawrence's opinion 4 in its entirety, which stated:

> "4. Mr. Knudson was negligent in that he allowed Mr. Turek to occupy the left seat of N920MC and to function as the pilot in command. As the owner of N920MC, Mr. Knudson was responsible to ensure a qualified aircrew was flying the airplane. Either he knew Mr. Turek was not qualified, or he did not check Mr. Turek's qualifications. Either way, he was negligent. Further, he should have known that Mr. Turek was not aeronautically adapted to fly N920MC at night, having never flown a Cessna 421 at night. Even further, he should have factored in the deteriorating weather."

¶ 72       The trial court reasoned that any opinion concerning Knudson's knowledge was speculative and unsupported by the evidence. The plaintiff makes a similar argument to that set forth above concerning Fruchter's opinion 7. We find that this opinion by Lawrence is the same in all material aspects to Fruchter's opinion 7, and for the same reasons we discussed above, we conclude that Lawrence's opinion 4 was properly stricken.

¶ 73                              c. *Lawrence's Opinion 5*

¶ 74       The trial court struck the italicized portion of Lawrence's opinion 5, as follows:

"5. *Mr. Turek was not aeronautically adapted to fly as the pilot in command of N920MC. Mr. Turek was neither qualified to fly at night nor was he adapted to fly at night in a Cessna 421.* He had logged only one night landing in the previous 90 days and had never flown a Cessna 421 at night."

¶ 75    In striking this portion of this opinion, the trial court stated, "Again, *** I don't know what aeronautically adapted means or that he was adapted to fly at night. *** So the first portion with regard to his qualifications to fly at night would be out." The plaintiff argues that the phrase "aeronautically adapted" refers to the fact that most of Turek's experience as pilot-in-command was in the Baron B55 airplane he owned and, as of the date of the crash, he was not yet adapted to flying in the Cessna 421B, especially at night. In a preceding part of his affidavit, Lawrence provides a factual explanation of the differences between piloting a Baron B55 and a Cessna 421. We will consider this opinion on our *de novo* review of the propriety of summary judgment.

¶ 76                                    d. *Lawrence's Opinions 8 and 9*

¶ 77    The plaintiff's brief addresses Lawrence's opinions 8 and 9 together, both of which the trial court struck in their entirety:

> "8. Mr. Turek flew a VFR downwind entry to runway 34 and arrived at an abeam position too close to the runway and too slow. The wind was right-gear quartering, blowing N920MC towards the runway and increasing the ground speed. Even if Mr. Turek had planned an appropriate distance from the runway for his abeam position, the wind would have served as a mechanism to place the airplane closer to the runway than desired. Since night vision is limited, especially in poor weather conditions, it would have been very difficult for Mr. Turek to perceive the improper alignment.
>
> 9. Mr. Turek either tightened his turn to the point that he entered an approach turn

stall, or increased the angle of attack and bank angle to the point that he stalled the aircraft. In either event, Mr. Turek stalled N920MC as he turned for final. More likely than not, Mr. Turek did not recognize the imminent danger posed by his poor approach to landing. Also, he did not want to ask for assistance from the man he was seeking to impress, so he continued the approach, and whether he simply slowed below stall speed, or pulled the airplane into an approach turn stall, the results were the same."

¶ 78     The trial court struck these opinions on the basis that they amounted to speculation and conjecture. The plaintiff argues that they are not, pointing out that, in both of these opinions, Lawrence articulates the likely reason that the airplane stalled and crashed. The plaintiff argues that these opinions were based on factual information that Lawrence had about the airplane and the flight at issue, which Lawrence had previously set forth in earlier sections of his affidavit. The plaintiff specifically points out that the stall speeds of the airplane, the weather conditions, and the differences between a Cessna 421B and Baron B55 were all facts known to Lawrence.

¶ 79     The plaintiff argues that, in preceding portions of his affidavit, Lawrence had set forth the facts he had relied upon from the radar data plots and video images from a security camera, which showed the aircraft in left-wing low, near-vertical descent. On this point, Lawrence explains the following in a preceding portion of his affidavit:

"The radar plots show that N920MC approached the Palwaukee Airport from the northwest, and flew an approximate 170° heading to intercept the downwind entry for landing runway 34. The radar plot also indicates that when clearance to land was issued, N920MC was approximately abeam the upwind numbers of runway 34 entering a left downwind. N920MC was approximately paralleling runway 34 on the downwind entry. Final hits on the radar plot show N920MC turning for final.

Video images captured on a local security camera show an aircraft with landing lights on approaching from the north of the camera location on a southerly hearing. About 15 seconds later, the aircraft reappears. Three frames of camera video capture the aircraft in a left wing low, near vertical descent. The underside of the aircraft is visible and shows extended landing gear. Flap position could not be determined because of the poor quality of the video."

The plaintiff also points out that Lawrence had explained the aerodynamic phenomenon of an accelerated-turn stall and an approach-turn stall, as well as the difficulties in night-flight perceptions. As to accelerated-turn stalls and approach-turn stalls, Lawrence's affidavit states:

"An accelerated turn stall is an aerodynamic phenomenon that causes an airplane to stall at a higher airspeed than normal because of additional G forces imposed by the pilot. An accelerated turn stall can be experienced in the landing pattern when the pilot's abeam position is too close to the runway and he or she continues to attempt the landing by executing a tighter turn. In that case, the accelerated turn stall is appropriately called an 'approach turn stall.' Physics show that, at 2G, the stall speed increases to a speed that is proportional to the square root of the wing loading."

Additionally, Lawrence's affidavit explains certain differences between the subject Cessna 421B and the Beech B55 airplane that Turek owned and was used to flying. This includes differences in the size and performances of the two airplanes, as well as differences in the airplanes' stall speeds and landing patterns. Then, as to the difficulties in night-flight perceptions, Lawrence's affidavit states:

"Aviators understand that, all other things being equal, night flights contain the potential for unique difficulties. Visibility is, of course, greatly reduced. Depth of field is

essentially nonexistent. Scan patterns are necessarily different. Of particular interest in this crash is the fact that perception of the proper landing pattern is more difficult to achieve. When the approach to landing is not a straight-in instrument approach or a ground-guided approach, the pilot must judge distance from the runway and manage angle of attack, turn rates, descent rates, and power settings more judiciously. When flying approaches at night, experience in the aircraft is even more important than during the day.

In general aviation, VFR approaches to landing are not flown the same as military approaches. Military aircraft normally fly traffic patterns, calling the numbers for a left or right break to a downwind entry, calling abeam with the gear for landing. In general aviation, aircraft are most often cleared for landing via the most expeditious approach. Therefore, flying downwind entries for landing and having to set up for a landing from an abeam position is the exception rather than the rule. General aviation pilots experience the bulk of their 'normal approaches' only when practicing touch-and-go landings and remaining in the traffic pattern. With that explanation, Mr. Turek was ill-equipped to attempt a landing in poor weather, at night, in an aircraft type he had never flown at night. The task of landing is one of the more rigorous tasks a pilot has, and pilots will revert to habit patterns in the absence of certain information. Mr. Turek, more likely than not, reverted to more substantial experience in his Baron, N281R, and set up to fly a slower, close-in approach."

Based on all of this, the plaintiff argues that there is sufficient evidence of what happened to the aircraft while Turek was at the controls on a final approach for landing.

¶ 80 We conclude that the trial court properly struck Lawrence's opinions 8 and 9, as they lack

factual support in the evidence and are ultimately speculation about what might have happened. As we discussed above concerning Fruchter's opinion 14, we believe there is factual support in the evidence for what happened to the airplane itself. It experienced a stall, and that caused it to crash. However, Lawrence is still relying on speculation concerning what if anything Turek did to cause the stall. For example, in opinion 8 there are no facts in evidence that Lawrence relies upon to state what Turek "planned" or "desired" as an appropriate distance from the runway for an abeam position given the wind. Similarly, there are no facts in evidence that Turek actually had difficulty perceiving an improper alignment due to limited night vision or poor weather conditions. We find Lawrence's factual explanation of the difficulties in night-flight perception, as set forth above, to be pure speculation concerning any difficulties Turek actually encountered due to nighttime conditions, and we find no basis in the evidence for the statement that Turek "reverted to more substantial experience in his Baron *** and set up to fly a slower, close-in approach." All these opinions appear to be conjecture about what might have happened.

¶ 81         Similarly, in opinion 9, Lawrence gives two possibilities for how Turek, as the pilot of the airplane, might have caused the airplane to stall. However, a full reading of Lawrence's affidavit shows that he is simply stating two things that a pilot might do that could cause an airplane to stall on approach and crash. He references no facts in evidence upon which he relies to support an opinion as to what Turek himself actually did. Whatever happened inside the cockpit remains speculation. This speculation becomes more evident in the sentences that follow, as there are simply no facts in evidence to support Lawrence's opinion that Turek likely "did not recognize the imminent danger posed by his poor approach to landing" and he "did not want to ask for assistance from the man he was seeking to impress, so he continued the approach." For these reasons, the trial court properly struck Lawrence's opinions 8 and 9 as speculative.

¶ 82                                            e. *Lawrence's Opinion 10*

¶ 83        The trial court struck Lawrence's opinion 10 in its entirety, which stated:

> "10. Mr. Knudson was negligent in that he failed to take control of the N920MC
> when he should have recognized the approach was not being flown as necessary for a
> successful landing. The only pilot in N920MC with appropriate experience to recognize
> the danger of the approach that was being flown was Mr. Knudson, the owner of the
> airplane. Although conversation that occurred in the cockpit will never be known, it is
> obvious that Mr. Knudson either never took control of the aircraft or did not take control
> in time to prevent the stall and ensuing crash. Mr. Knudson's experience in the Cessna
> 421, and his ownership of N920MC, positioned him in a place of responsibility that he
> did not assume."

¶ 84        The trial court struck this opinion on the basis that it was speculation. The plaintiff argues
that this opinion is not speculative, because Lawrence's opinion that Knudson was negligent
arises from the known fact that Knudson either (1) never took control of the aircraft or (2) did
not take control of the aircraft in time to prevent the stall and subsequent crash. The plaintiff
points out that Lawrence explained that the reason Knudson should have taken control is that he
was the only pilot on board with the adequate experience to understand the danger in the landing
approach that Turek was flying.

¶ 85        The trial court properly struck this opinion as speculation, as there are no facts in evidence
to support a statement of what actually happened inside the cockpit of the subject airplane. This
would include evidence of any knowledge Knudson ascertained during the flight itself
concerning Turek's competency to land the subject airplane, so as to require Knudson to
terminate the entrustment of the airplane to Turek. Any other liability sought to be imposed by

this opinion would amount to Knudson's negligence in supervising Turek during the subject flight, and we have previously affirmed the dismissal of this theory of liability against the Estate of Knudson. *Garland I*, 2014 IL App (1st) 112615, ¶ 82.

¶ 86                                    f. *Lawrence's Opinion 13*

¶ 87        The trial court struck Lawrence's opinion 13 in its entirety, which stated:

> "13. N920MC crashed because of the combined negligence of [Messrs.] Knudson, Turek, and Levinson. The combination of the negligent acts of Knudson, Turek, and Levinson, as discussed in the paragraphs above, was responsible for, and was the cause of the crash of N920MC."

¶ 88        The trial court's reasoning for striking this opinion was that Lawrence lacked an adequate factual basis to establish causation. The plaintiff argues that the trial court's striking of this opinion was error, because Lawrence explained throughout his affidavit how Turek was unqualified to be pilot-in-command and therefore should not have been permitted by Levinson and Knudson to be operating the airplane at the time of the crash. According to the plaintiff, that alone establishes that the decision by the defendants to entrust their Cessna 421B to Turek, despite his inexperience and lack of night-flight qualifications, was a contributing cause of this crash. The plaintiff argues that if the defendants had not improperly entrusted the plane to Turek to fly, the flight and crash would never have occurred. The plaintiff argues further that Lawrence articulated a sufficient factual basis for the aerodynamic performance of this airplane that caused it to stall and crash.

¶ 89        For the same reasons we discussed with respect to Fruchter's opinion 14, we believe that the trial court properly struck Lawrence's opinion 13. In this claim for negligent entrustment, Lawrence's affidavit fails to identify some act or omission that Turek did or failed to do as a

result of his inexperience or incompetence that caused the airplane to stall and crash, on which Lawrence can rely to express an opinion about causation. As such, Lawrence's opinion 13 on causation was based on speculation and was properly stricken.

¶ 90                                    B. Summary Judgment

¶ 91        Having resolved the issues concerning the sufficiency of the affidavits of Fruchter and Lawrence, we now proceed to address the trial court's granting of summary judgment in favor of the defendants on the claims of negligent entrustment. The plaintiff argues that sufficient evidence exists in the summary judgment record from which a jury could reasonably conclude that the defendants were negligent in entrusting the Cessna 421B to Turek for the flight at issue, and their negligent entrustment of the airplane to him was a proximate cause of the crash in which Garland died. The plaintiff also argues that the doctrine of *res ipsa loquitur* is applicable in this case to demonstrate the existence of a genuine issue of material fact.

¶ 92        On appeal of an order granting summary judgment, the role of this court is to determine whether "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). The purpose of summary judgment is not to try an issue of fact but to determine whether one exists. *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. In determining this question, the evidence in the record must be construed strictly against the parties moving for summary judgment and liberally in favor of the party opposing it. *Id.* A plaintiff seeking to defeat a motion for summary judgment does not need to

prove her case, but she must present some factual basis that would arguably entitle her to a judgment. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12. This includes presenting some evidence to support each element of the plaintiff's cause of action. *Id.* This court reviews the trial court's summary judgment ruling *de novo*. *Monson*, 2018 IL 122486, ¶ 12.

¶ 93                                             1. Proximate Causation

¶ 94        The trial court granted summary judgment in favor of the defendants based on its conclusion that the plaintiff had failed to present evidence showing that a genuine issue of material fact existed about whether the defendants' negligent entrustment of the airplane to Turek was a proximate cause of the crash. The trial court found that the evidence did not show what Turek had done, if anything, to cause the crash of the airplane and that the plaintiff's experts' opinions about what Turek had done to cause the crash were based only on speculation. The trial court further concluded that the plaintiff's expert witnesses had not shown a causal nexus between the airplane crash and the specific reasons that they contended should have prevented the defendants' entrustment of the airplane to Turek. As the absence of evidence of proximate causation was the basis for the trial court's granting of summary judgment, we begin our analysis with this issue.

¶ 95        An essential element of a plaintiff's cause of action for any tort is the existence of a proximate causal relationship between the act or omission of the defendant and the damages that the plaintiff has suffered. *Lewis v. Lead Industries Ass'n*, 342 Ill. App. 3d 95, 102 (2003). To establish proximate cause, a plaintiff must satisfy the requirement of showing that the defendant's conduct is a cause in fact (or actual cause) of the plaintiff's injury, and it must be a legal cause as well. *Simmons v. Garces*, 198 Ill. 2d 541, 558 (2002). These requirements apply in a negligent entrustment claim. *Evans*, 201 Ill. 2d at 434-35. Cause in fact exists where there is a

reasonable certainty that a defendant's acts caused the injury or damage. *Id.* at 434. A defendant's conduct is a cause in fact of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury. *Id.* at 435. A defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred. *Id.* A defendant's acts are a legal cause of an injury only if they are " ' "so closely tied to the plaintiff's injury that he should be held legally responsible for it." ' " *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004) (quoting *Simmons*, 198 Ill. 2d at 558, quoting *McCraw v. Cegielski*, 287 Ill. App. 3d 871, 873 (1996)). This involves " 'a policy decision that limits how far a defendant's legal responsibility should extend for conduct that, in fact, caused the harm.' " *Simmons*, 198 Ill. 2d at 558 (quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992)). Legal cause is essentially a question of foreseeability, with the relevant inquiry being whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct. *Evans*, 201 Ill. 2d at 435. Although proximate cause is generally a question of fact, the absence of proximate cause may be determined by the court as a matter of law when the evidence does not sufficiently demonstrate both cause in fact and legal cause. *Young v. Bryco Arms*, 213 Ill. 2d 433, 447 (2004).

¶ 96    The plaintiff bears the burden to " 'affirmatively and positively show' " that the defendant's alleged negligence caused the injury for which the plaintiff seeks recovery. *Bermudez v. Martinez Trucking*, 343 Ill. App. 3d 25, 29 (2003) (quoting *McInturff v. Chicago Title & Trust Co.*, 102 Ill. App. 2d 39, 48 (1968)). The existence of proximate cause cannot be established by speculation, surmise, or conjecture. *Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707, 711 (1994).

¶ 97    We explained above (*supra* ¶ 33) that establishing proximate causation in a negligent

entrustment case requires a plaintiff to show that the incompetency, inexperience, or recklessness on the part of the entrustee, about which the plaintiff alleges that the defendant knew or should have known so as to prevent the entrustment, is a proximate cause of the injury at issue. See *Bensman*, 299 Ill. App. at 534. The evidence must show the existence of a causal nexus between the incompetence, inexperience, or recklessness that the plaintiff alleges should have prevented the entrustment and the entrustee's act or omission that produced the injury. *Id.* at 534-36.

¶ 98     In her briefs, the plaintiff appears to take issue with this concept that establishing proximate causation requires proof of a specific act or omission by Turek that ultimately caused the crash. In framing her argument on this issue in her opening brief, she contends that the defendants argued in the trial court that she needed to prove "that Knudson and Levinson had to have observed Turek perform a specific act of incompetence that ultimately caused the crash." She goes on to argue that no law requires her to prove that the defendants "knew the specific manner in which Turek's incompetence, inexperience or reckless would result in him crashing the plane," and that the defendants were thus attempting to impose a burden on her that was not required. She frames the issue the same way in her reply brief, adding that the law of negligent entrustment does not require that "a specific 'red flag' circumstance has to be directly connected to the ultimate injury."

¶ 99     By framing her argument as she does, it appears to us that the plaintiff is missing the point of the weakness in the evidence that gave rise to the entry of summary judgment. Regardless of what arguments the defendants made in the trial court, the trial court did not grant summary judgment on the basis that the defendants did not observe, know, or foresee the specific act of incompetence, inexperience, or recklessness on Turek's part that ultimately caused the crash. Rather, the trial court granted summary judgment on the basis that the evidence did not

demonstrate what specifically caused Turek to crash the airplane and, thus, no causal nexus was shown between the specific reason why the entrustment was allegedly negligent and the crash itself.

¶ 100    We believe that the trial court properly applied the law. Since *Bensman* it has been required in proving a negligent entrustment case that it appear from the evidence "that the incompetency alleged was the proximate cause of the commission of the negligent act which caused the injury." *Id.* at 534. In *Bensman*, the plaintiff alleged that the defendant was negligent in entrusting his automobile to his son, because he knew that his son had defective vision that rendered him an incompetent driver. *Id.* at 533. However, the appellate court affirmed the trial court's entry of judgment *n.o.v.* in favor of the defendant because, at trial, the plaintiff presented "no evidence which tends to prove that [the son's] defective vision was the cause of his negligent act." *Id.* at 536. The court stated, "It may be conceded that he was negligent in making the turn at the time and under the circumstances he did but this does not establish that such negligent act was caused by defective vision." *Id.*

¶ 101    The same principle that applied in *Bensman* applies in this case. Here, it is possible that Turek committed a negligent act or an error that caused the airplane to stall and crash, which had nothing to do with any lack of competence, qualifications, or experience in flying a Cessna 421B at night. Competent, qualified, and experienced pilots can commit isolated errors of acts of negligence that can cause an airplane crash. Thus, we will not assume in a negligent entrustment case that the mere fact that an airplane stalled and crashed is evidence that it was due to incompetence or inexperience on the part of the pilot. Rather, this must be affirmatively and positively shown. To presume, in the absence of proof, that any negligence or error by Turek is the product of the incompetence on his part that should have prevented the entrustment of the

airplane to him would relieve the plaintiff of her burden of making an affirmative and positive showing of proximate cause in this case. It would also improperly make the defendants vicariously liable for any negligent act of Turek, regardless of the scope of their own independent negligence. See *Seward*, 116 Ill. App. 3d at 754. The trial court properly applied this law, and thus we disagree with the plaintiff that she was faced with a burden of proof beyond that which was required by the case law.

¶ 102 Moreover, we agree with the trial court's determination that the plaintiff has failed to establish evidence that the crash resulted from an act or omission by Turek that was the result of the specific incompetence, inexperience, or recklessness that allegedly should have prevented the defendants' entrustment of the airplane to him. According to the opinions of Fruchter and Lawrence that are in evidence, the incompetence or inexperience on the part of Turek, about which the defendants knew or should have known so as to prevent their entrustment of the airplane to him, was that he lacked the requirements of having made at least three takeoffs and landings at night within the preceding 90 days (see 14 C.F.R. § 61.57(b) (2006)), he lacked the requirement of a biennial flight review in the preceding 24 months (see *id.* § 61.56(c)), and he had no flight experience in a Cessna 421B at night or icing conditions. It does not appear that their opinions make any attempt to establish that the crash was caused by Turek's lack of a current biennial flight review or his lack of experience flying a Cessna 421B in icing conditions. Although icing was forecasted, there is no evidence that icing was an issue on the subject flight.

¶ 103 Lawrence did attempt in opinion 8 of his affidavit to establish a causal nexus between Turek's inexperience with night landings and the crash at issue. As discussed above, Lawrence expressed the opinion that it would have been difficult for Turek to perceive improper alignment of the airplane due to limited night vision, especially in poor weather conditions. However, we

held above that this opinion by Lawrence lacked any factual support in the evidence and was properly stricken as speculation and conjecture as to what might have occurred. In other words, without proof of any specific act or omission by Turek that caused the crash, it is speculation to say that it was caused by his having problems with limited night vision. Thus, we find that the evidence establishes no causal nexus between the crash and any of the specific reasons that the experts contend Turek was incompetent or inexperienced so as to prevent the defendants' entrustment of the airplane to him.

¶ 104    Even looking beyond the experts' affidavits to the other evidence discussed by the plaintiff, we reach the same conclusion. In her briefs, the plaintiff addresses a number of reasons that, she contends, Turek was not competent and experienced enough in piloting the Cessna 421B for the defendants to entrust it to him for the flight at issue. She points out that Turek's logbook indicates that he only had a total of 5.25 hours of logged dual instruction in a Cessna 421B airplane. She notes that the training he received at Arr-ow was only generic simulation training, not tailored to a Cessna 421B, and it did not provide him with experience pitching up or down, yawing, or dealing with the effects of vortex generators on a multiengine airplane such as a Cessna 421B. She further points out that Lyons and other of Turek's instructors at Recurrent had made notations during his instruction there that he needed more training on full procedure approaches, that his tracking of his approach was "erratic," that he "needs to work on altitude control" as it appeared that "he was still having a little trouble flying the flight training device," and that he needed help with the horizontal situation indicator. She further points to evidence that Levinson knew Turek "liked to fly fast," that he "flew kind of like a sports car driver," and that he rode the brakes too much. Moreover, she cites the testimony of McGuinn that, while in Kansas on the day of the crash, Knudson had complained about Turek's operation of the plane

during takeoff and his leaving the landing gear down for part of the flight and Knudson had made a comment that Turek's flying skills were not up to par.

¶ 105    Assuming for argument's sake that the defendants knew or should have known some or all of these facts, there is still no causal nexus between the crash and some act or omission by Turek that resulted from one of these specific aspects of incompetency, inexperience, or recklessness that should have prevented the defendants' entrustment of the airplane to him. Again, absent some affirmative and positive evidence of this fact, we will not assume in this negligent entrustment case that the fact that the airplane stalled and crashed is evidence that it was due to incompetence, inexperience, or recklessness on the part of Turek.

¶ 106    The plaintiff argues on appeal that the summary judgment record contains sufficient direct and circumstantial evidence that Turek, in approaching Palwaukee for landing, operated the airplane at a speed that was too slow to avoid a stall and too close to the runway, which resulted in a stall of the airplane and its impact with the ground. The plaintiff argues that this direct and circumstantial evidence is sufficient to establish that the negligent entrustment of the airplane to Turek and his negligent operation of it sufficiently establish proximate causation.

¶ 107    The plaintiff is correct that proximate cause may be established through direct or circumstantial evidence. *Gyllin*, 260 Ill. App. 3d at 713; *Bermudez*, 343 Ill. App. 3d at 30. Where a plaintiff attempts to establish proximate causation through circumstantial evidence, causation may be shown by facts and circumstances that, in the light of ordinary experience, reasonably suggest that the defendant's negligence operated to produce the injury. *Gyllin*, 260 Ill. App. 3d at 713; *Berke*, 2016 IL App (1st) 150397, ¶ 35. While it is not necessary that only one conclusion follow from such evidence, a fact cannot be established through circumstantial evidence unless the circumstances are of such a nature and so related to each other that it is the only probable,

and not merely possible, conclusion that can be drawn therefrom. *Berke*, 2016 IL App (1st) 150397, ¶ 35 (citing *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 796 (1999)). Where the proven facts demonstrate that the nonexistence of the fact to be inferred appears to be just as probable as its existence, then the conclusion is a matter of speculation, conjecture, and guess, and the trier of fact cannot be permitted to make that inference. *Berke*, 2016 IL App (1st) 150397, ¶ 35.

¶ 108      First, the plaintiff points to evidence that the operator's manual for the Cessna 421B at issue specifies a landing approach speed of 103 knots-indicated airspeed. The plaintiff points out that defendant Levinson himself testified that he landed the subject airplane at a speed of about 110 knots. The owner's manual for the subject airplane lists stall speeds ranging from 94 knots-calibrated airspeed to 83 knots-calibrated airspeed in different configurations for the landing gear, flaps, and bank angle. The plaintiff goes on to point out that radar data showed that, in the last 40 seconds of the subject flight, the Cessna's calibrated airspeed decreased from 110 knots to 82 knots, before radar contact was lost and the impact occurred. The plaintiff cites the deposition testimony of NTSB investigator Brannen that, in normal flight, one of the responsibilities of the pilot-in-command is to make sure that an airplane does not drop below the manufacturer's recommended stall speeds.

¶ 109      Also, the plaintiff cites evidence that in about the last 30 seconds, the radar returns showed that the airplane was about 450 to 550 feet above ground level "as it was on the downwind leg about to turn base." The plaintiff cites Brannen's deposition testimony that, while travel patterns and altitudes can vary by airport, in general travel patterns for an airplane approaching and on the downwind leg are usually about 800 to 1000 feet above the elevation of the airport. Thus, the plaintiff argues, Turek flew the airplane below the recommended pattern altitude for that phase

of the flight. The plaintiff also points to the portion of Fruchter's opinion 5 not stricken by the trial court, in which Fruchter relied on radar data, witness statements, and video of the incident to explain that the airspeed of the subject airplane decreased until it stalled, causing a loss of control and impact with the ground. The plaintiff points to Lawrence's opinion 11, which was also not stricken by the trial court, in which Lawrence relied on radar information to explain that the subject airplane probably stalled at about 650 feet above ground level and, when it entered the stall, there was not sufficient time or altitude to recover from the stall.

¶ 110 Again bearing in mind that this is a case for negligent entrustment, we reject the plaintiff's argument that this evidence reasonably supports an inference that the crash resulted from an act or omission on the part of Turek that was the product of the specific incompetence, inexperience, or recklessness that allegedly should have prevented the defendants' entrustment of the airplane to him. As discussed above, while it is possible that this evidence could show negligence or pilot error on the part of Turek, merely showing negligence is not enough. See *Bensman*, 299 Ill. App. at 534-36. This is not a negligence claim against Turek, nor is this a case in which the defendants can be held vicariously liable for Turek's negligence. Rather, the plaintiff must make an affirmative and positive showing that the crash resulted from an act or omission that was the product of Turek's specific incompetence or inexperience that should have prevented the entrustment by the defendants. The circumstantial evidence cited by the plaintiff fails to do this.

¶ 111 Any inference that this airplane crashed because Turek was incompetent or too inexperienced to pilot a Cessna 421B at night would ultimately have to be based on speculation and conjecture. The evidence shows that Turek was an experienced pilot, although the majority of his flying experience appears to have been in a Baron B55. He had undergone training to transition to the piloting of a Cessna 421B, even if his flight instructors indicated there were

areas on which he needed work. Given his experience and training, we do not find that it can be reasonably inferred from the evidence presented that the only probable reason that the airplane stalled and crashed was Turek's specific lack of competence or inexperience flying a Cessna 421B at night. This is merely one possible conclusion that can be drawn from the evidence, which makes it insufficient to establish proximate cause. See *Berke*, 2016 IL App (1st) 150397, ¶ 35.

¶ 112    The parties' briefs discuss various reasons other than Turek's incompetence or inexperience that may have caused the airplane to stall and crash. Some of the reasons postulated by the defendants, such as the possibility that "the airspeed gauge post light went out," have no support in the evidence as being potential causes for an airplane stall or crash. Other reasons, such as the possibility that one of the passengers had a medical emergency or did something that caused the pilot to lose full concentration, appear plausible but speculative. The plaintiff argues that the testimony of Dr. Lavezzi allows for the inference that Turek did not suffer from a medical condition such as a heart attack during the flight. She argues that the evidence allows for the inference that icing can be ruled out as a potential cause, as the subject airplane was equipped to fly in icing conditions and a competent pilot must avoid icing and minimize flight time in icing conditions. She also cites the testimony of NTSB investigator Brannen as supporting the inference that equipment failure or fuel starvation can be ruled out as potential causes. Ultimately, regardless of whether some alternative explanations can be ruled out, we find that the circumstantial evidence does not allow for the reasonable inference that the only probable, and not merely possible, reason that the airplane stalled and crashed was Turek's specific lack of competence or inexperience flying a Cessna 421B at night. As we have stated multiple times, proving negligence or pilot error is not enough in this case alleging negligent entrustment.

¶ 113    For the above reasons, we hold that the trial court was correct in its determination that the evidence in the summary judgment record fails to demonstrate the existence of a genuine issue of material fact about whether the defendants' negligent entrustment of the airplane to Turek was a proximate cause of the crash in which Garland was killed. For this reason, the trial court properly granted summary judgment in favor of the defendants.

¶ 114                                    *2. Res Ipsa Loquitur*

¶ 115    The plaintiff also argues that application of the doctrine of *res ipsa loquitur* required the denial of summary judgment. This doctrine requires proof that the plaintiff was injured (1) in an occurrence that ordinarily does not happen in the absence of negligence, (2) by an agency or instrumentality within the defendant's exclusive control. *Heastie v. Roberts*, 226 Ill. 2d 515, 531-32 (2007). It is an evidentiary doctrine that affects the proof from which the trier of fact may draw an inference of negligence on the part of the defendant, but it does not affect the necessity or method of proving proximate cause. *Darrough v. Glendale Heights Community Hospital*, 234 Ill. App. 3d 1055, 1059 (1992). The plaintiff argues that, here, the defendants had complete control over the decision to authorize Turek to act as pilot-in-command on the subject flight and there is no evidence that the crash would have occurred in the absence of the defendants' negligent entrustment of the plane to an inexperienced and unqualified pilot.

¶ 116    In *Crowley v. A-North Shore Driving School*, 19 Ill. App. 3d 1035, 1036-38 (1974), this court addressed the argument that the doctrine of *res ipsa loquitur* applied to a claim of negligent entrustment by a driver's license examiner against a driving school, where a student of the school crashed and injured the examiner while he was administering a driving test to the student. In holding that the doctrine was inapplicable to the case, the court set forth the rule that, for *res ipsa loquitur* to apply, "it is necessary to prove the defendant's control of the immediate

cause of the injury is exclusive; the doctrine cannot be invoked without evidence tending to establish that the injury complained of was caused by someone under defendant's control." *Id.* at 1038. The defendants argue that, here, the plaintiff has presented no proof that the defendants exclusively controlled "the immediate cause of the injury" because, as discussed above, there is no evidence as to exactly what that "immediate cause" was. We agree with the defendants on this point.

¶ 117　　　　With respect to the requirement that the injury-causing agency or instrumentality be within the defendants' exclusive control, "it must be shown that the plaintiff's injury can be traced to a specific instrumentality or cause for which the defendant was responsible or that he was responsible for all reasonable causes to which the incident could be attributed." *Nichols v. City of Chicago Heights*, 2015 IL App (1st) 122994, ¶ 46. "Thus, the defendant's responsibility for a specific cause of an event is proven by eliminating the responsibility of any other person for that cause." (Emphasis omitted.) *Id.* (citing *Lynch v. Precision Machine Shop, Ltd.*, 93 Ill. 2d 266, 273 (1982)). For the reasons we discussed above, we conclude that the evidence presented in this case is insufficient to satisfy this standard of proving that the specific cause of the airplane crash at issue was an act or omission resulting from Turek's incompetence or inexperience and, therefore, within the defendants' exclusive control. Thus, the doctrine of *res ipsa loquitur* has no application in this case.

¶ 118　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 119　　　　In conclusion, we affirm the order of the trial court granting summary judgment in favor of the defendants and against the plaintiff.

¶ 120　　　　Affirmed.

**No. 1-18-0682**

| | |
|---|---|
| **Cite as:** | *Garland v. Sybaris Clubs International, Inc.*, 2019 IL App (1st) 180682 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-8307; the Hon. Irwin J. Solganick, Judge, presiding. |
| **Attorneys for Appellant:** | Richard F. Burke Jr., of Clifford Law Offices PC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | John S. Hoff and Jared A. Schneider, of Cremer, Spina, Shaughnessy, Jansen & Siegert, LLC, of Chicago, for appellees Sybaris Clubs International, Inc., and Sybaris Ventures One, LLC. |
| | Joseph A. Bosco and David J. Aron, of LaRose & Bosco, Ltd., of Chicago, for appellee HK Golden Eagle, Inc. |
| | Alan L. Farkas and Michael S. McGrory, of SmithAmundsen, LLC, of Chicago, for appellee Randell D. Repke. |
| | William F. DeYoung and Loretto M. Kennedy, of Chuhak & Tecson, P.C., of Chicago, for other appellees. |